UNITED STATES v. BURLEY et al.

(Circuit Court, D. Idaho, C. D. March 29, 1909.)

1. EMINENT DOMAIN (§ 66*)—GOVERNMENT IRRIGATION WORKS—CONDEMNATION PROCEEDINGS.

In a proceeding by the United States to condemn land for reservoir purposes under Irrigation Act June 17, 1902, c. 1093, § 1, 32 Stat. 388 (U. S. Comp. St. Supp. 1907, p. 511), whether a more feasible plan of irrigation than the one adopted might be devised, or some other site selected for the reservoir, is immaterial; the determination of the proper government authorities being conclusive.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 165–167; Dec. Dig. § 66.*]

**2. EMINENT DOMAIN (§ 14\*)—GOVERNMENT IRRIGATION WORKS—CONSTRUCTION OF STATUTE.**

The fact that an irrigation scheme projected by the government under Irrigation Act June 17, 1902, c. 1093, § 1, 32 Stat. 388 (U. S. Comp. St. Supp. 1907, p. 511), contemplates the irrigation of private lands, as well as a large tract of government land, and that the owners of the private lands are assisting and co-operating therein, does not render the project illegal, nor deprive the Secretary of the Interior of the power given by the act to condemn lands necessary to carry it out.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. § 54; Dec. Dig. § 14.\*]

C. H. Lingenfelter, Hugh E. McElroy, C. E. Stoutemyer, and S. L. Tipton, for the United States.

John G. Willis and J. L. Niday, for defendants.

DIETRICH, District Judge (orally). This is a proceeding in eminent domain, brought by authority of the Attorney General, on behalf of the United States, to condemn certain lands of the defendant for reservoir purposes, pursuant to an application made therefor by the Secretary of the Interior, proceeding under the provisions of an act of Congress entitled "An act appropriating the receipts from the sale and disposal of public lands in certain states and territories for the construction of irrigation works for the reclamation of arid lands," approved June 17, 1902. Act June 17, 1902, c. 1093, 32 Stat. 388 (U. S. Comp. St. Supp. 1907, p. 511).

By agreement of counsel, all issues excepting that of the value of the lands taken were submitted to the court without a jury. Two general questions are presented by the record: Does the law authorize the Secretary of the Interior to construct a project of the character of that for which these lands are sought? And are the lands reasonably necessary to such construction?

The latter question may be summarily disposed of. Without conflict, the evidence conclusively shows that the reservoir, which is an essential feature of the projected irrigation system, cannot be utilized to its full capacity without submerging the defendant's lands. Leaving out of consideration lands privately owned, it will be necessary to maintain the impounded water at a level above the lands in question in order to reach tracts the title to which is still in the government. It follows that the taking of these lands is necessary, if the plan of irrigation adopted by the Secretary of the Interior is to be carried out. Whether, as has been suggested, an equally feasible, or more feasible, scheme might not be devised, and whether some other reservoir site might not be selected, are immaterial inquiries. The record discloses no circumstances or conditions taking the case out of the general rule that, in the absence of bad faith, the judgment of the party exercising the right of eminent domain as to what and how much land shall be taken is conclusive.

The other point, the authority of the Secretary of the Interior to engage in such an enterprise, involves somewhat different, though kindred, considerations. Upon the part of the defendant it has been earnestly and persistently urged that the question is foreclosed, ad-

versely to the government, by the "Kansas-Colorado Case." Kansas v. Colorado, 206 U. S. 91, 27 Sup. Ct. 655, 51 L. Ed. 956. But I am unable to yield to this contention. The point in that case was that the government was claiming some dominant right to the waters of the Arkansas river, which was conceded to be a nonnavigable stream, and hence not within the jurisdiction of the general government as a natural highway. The contention for the government was that, for the purposes of reclaiming arid lands, it has superior authority over, and supervisory control of, the waters in such streams, to the exclusion of state jurisdiction. The conclusion of the court was that "each state has full jurisdiction over the lands within its borders, including the beds of streams and other waters." Here no such issue is tendered. The congressional act, from which alone the Secretary of the Interior derives his authority, expressly provides that in appropriating, distributing, and using water he shall proceed in conformity with the laws of this state; and it is not pretended here that the officers of the government claim, or have claimed, exemption from the limitations of such laws. Without going into details, it may be stated generally that the plaintiff, in prosecuting its work, has followed substantially the same course which, under the laws of Idaho, a private corporation, in appropriating and diverting public waters for the purposes of irrigation, must pursue.

The precise point upon which defendant chiefly relies in urging that the proceeding is without authority of law is that one of the purposes for which the reservoir is to be used is the irrigation of lands which had passed into private ownership prior to the inception of the project. Whether or not, under the Constitution, Congress is without the power to authorize the expenditure of public money and the exappropriation of private property for the irrigation of private lands exclusively, it is unnecessary at this time to inquire. As I view the act under which the plaintiff is proceeding, it was not intended thereby to confer upon the Secretary of the Interior such authority. At the time the act was passed, the government was the proprietor of boundless tracts of arid lands, practically worthless in their natural condition. The smaller, more accessible, streams had been largely appropriated for the irrigation of private lands. Private capital had not, to any considerable extent, looked with approval upon the usually speculative and often perilous enterprise of lifting from the deep canyons, in which they not infrequently flow, the waters of the larger streams, for the irrigation of great bodies of land, as yet either wholly unoccupied, or at most but sparsely settled; and as a rule such lands would not be purchased or entered without some assurance of water for their future irrigation. Contemplating these conditions, Congress passed this act, primarily for the reclamation of these public lands. The government, as a proprietor, was directly interested in a pecuniary way in improving and rendering marketable that for which, in its natural condition, there was neither use nor demand.

But in carrying out this purpose it was foreseen that the administrative officers would encounter conditions where it would be both impracticable and unjust for them to proceed without the co-operation

of private owners. Of any specified tract, a considerable portion may have passed into private ownership before the law was enacted, or, after the enactment, before the land could be preliminarily withdrawn from entry. It might be impracticable for the government to proceed to the irrigation of the residue of public land in such a tract, unassisted by private owners, because of an inadequate acreage to justify the expense necessarily entailed by the magnitude of the enterprise. There would be no practicable relation between the cost of the project and the value of the lands owned by the government when supplied with water for irrigation. And, if practicable for the government to proceed alone, injustice might be done to private owners, where the aggregate of private lands is so small that an enterprise intended exclusively for their irrigation is not feasible. Generally speaking, the larger the area supplied, the less the acreage charge for water; and hence, as a usual thing, it is highly desirable, and not infrequently absolutely essential to success, that all owners of lands embraced in the same general tract join in the construction and maintenance of the primary irrigation works. That the act clearly contemplates such cooperation between the government and private owners is not open to discussion; and I am unable to yield to the view that Congress, by reason of any constitutional limitations, is precluded from authorizing such a sensible and necessary mode of procedure, if the government is to render available for use, and marketable, large tracts of its own land.

It remains briefly to state the facts pertinent to this point, as disclosed by the record. To the original complaint, which was silent as to the ownership of the lands to be irrigated from the reservoir, a demurrer was sustained; and, complying with the suggestions of the court, the plaintiff, in its amended complaint, alleged that the project was primarily for the irrigation of public lands, which were described in a general way. This allegation was denied, and upon the issue thus joined much evidence was received; wide latitude being given to both parties. It appears that, long prior to the commencement of this cause, the Secretary of the Interior, proceeding under authority of the act referred to, caused to be surveyed and located the Boise-Payette irrigation project, a feature of which is the reservoir in question, and determined that the same was practicable, and let contracts for the construction thereof. The reservoir, designated as the "Deer Flat," is in a natural basin comprising approximately 10,000 acres of land. Of the land embraced within the site, the plaintiff owns only a small portion; but of the lands adjacent thereto and in the vicinity thereof, and susceptible of irrigation therefrom, it was the owner of approximately 45,000 acres, and about the same amount, in the aggregate, was owned by private individuals, all being arid lands.

At the time the project was first surveyed and its feasibility considered, all the natural flow of the Boise river, the only available source of supply for the irrigation of these and other lands during the larger portion of the irrigating season, had been appropriated and was being diverted by private corporations for the irrigation of agricultural lands, and no considerable additional area could be irrigated, except

by storing and conserving waters flowing in the river during the winter months and during the high-water season. The project as finally decided upon involved the taking over of an existing system, called the "New York Canal," which was to be improved, enlarged, and extended, and through which water was to be carried to the reservoir during the season of the year when there was an adequate supply in the river for such purpose, and for delivering water to parties who already had the right to receive water therefrom by reason of existing contracts, and also to furnish water for the irrigation of lands belonging to plaintiff, and for the irrigation of unreclaimed lands belonging to private individuals; but the entire project was for the irrigation and reclamation of arid lands.

After the government had made some investigation, but before the project was finally decided upon, property owners and citizens of Ada and Canyon counties, where the lands are situated, entered upon a systematic agitation to promote the plan; and certain individuals, acting on behalf of the public, and complying with the laws of this state relative to the issuing of licenses for the appropriation of water, secured permits for such appropriation from the Boise river, and afterwards assigned the same to the United States, and the owners of arid lands, for the irrigation of which there was no available water, proffered to the government their assistance and co-operation, agreeing that if the government would undertake the project, and thereby furnish water for the irrigation of their lands, they would bear their proportion of the expense. In consideration of the large tracts of public land to be irrigated, and such assistance and co-operation by private owners, the project was adopted.

Upon the record, there can be no question that the primary purpose of the project is the irrigation of public lands, and that the officers of the government are not engaged in a scheme which is ostensibly for the irrigation of public lands, but which is, in reality, for the irrigation of private lands. The government's holdings are so extensive, and it has such a substantial pecuniary interest in the project, and it would receive such a direct benefit from it in the improvement of its own lands, that it cannot be said that its officers have resorted to the subterfuge of including a few acres of government lands in the scheme for the purpose of basing a claim, in bad faith, that its purpose is the irrigation of government land. There is no evidence of any design to evade the provisions of the law, or by indirection to exceed the authority thereby conferred. The government had large tracts of land of its own, which it was impracticable to irrigate unless it could receive the assistance and co-operation of private owners. It sought that assistance. At least, it gave out that it would not undertake to irrigate its own lands unless it did have such co-operation from private owners. The latter agreed to join in the enterprise, and the work was commenced. My conclusion, therefore, is that the project is within the law.

The jury having already determined the value of the lands to be taken, there remains no other question, and an order for judgment of condemnation will be entered in accordance with plaintiff's prayer.