BAILEY ET AL., RESPONDENTS, *v.* TINTINGER ET AL., DEFENDANTS; GLASS–LINDSAY LAND CO., APPELLANT.

(No. 3,064.)

(Submitted February 5, 1912.    Decided March 5, 1912.)

[122 Pac. 575.]

*Water Rights—Extent of Appropriation—When Appropriation Complete—Prospective Use—Public Service Corporations.*

Water Rights—Ditches Out of Repair—Extent of Right.
    1.    The right of an appropriator of water is not limited by the capacity of his canal while out of repair, unless that condition has existed for such length of time as to indicate his intention to claim no more water than it will carry in that condition.

Same—Ditches—Right to Make Repairs.
    2.    An appropriator of water may make such repairs on his canal or ditch as to make it perform the full service which it was intended to perform.

Same—Doctrine of Relation.
>    3. Before the statute (Rev. Codes, sec. 4849) makes applicable the doctrine of relation, with reference to the acquisition of a water right, a completed appropriation must have been effected.

Same—Appropriation Under Statute—When Complete.
>    4. *Held,* that the statute (Rev. Codes, sec. 4840 *et seq.*) provides for all the steps necessary to be taken by one seeking to make an appropriation of water, and that, therefore, one who proceeds under it, instead of under the rules and customs of the early settlers, has a completed appropriation when the work on his ditch or canal is finished and before the water is actually applied to its intended use.

Same—Appropriator Need not Own Land.
>    5. To make a valid appropriation of water for agricultural purposes, the appropriator need not be the owner or in possession of land upon which to use it.

Same—Use may be Prospective.
>    6. While an appropriation of water must be for some useful or beneficial purpose, the use to which it is to be applied need not be immediate, but may be prospective or contemplated.

Same—Public Service Corporations—When Appropriation Complete.
>    7. *Held,* under the rule declared in paragraph 4 above, that a public service corporation organized for the purpose, *inter alia,* of constructing an irrigation system and selling or renting water to reclaim arid lands, has a completed appropriation of water when its distributing system is finished and when the corporation is ready to deliver water to users upon demand, and offers to do so; its right, however, may be lost by abandonment or nonuser for an unreasonable time.

Same—Intent of Appropriator.
>    8. The claimant of a water right must, at the time he takes the initial steps looking to an appropriation, have an intention to apply the water to a useful or beneficial purpose.

Same—Extent of Appropriation.
>    9. The needs of a water appropriator and his facilities for diversion, if equal, measure the extent of his appropriation; if his needs exceed the capacity of his ditch or canal, the capacity of his means of diversion measures the extent of his right; and if the capacity of his ditch is greater than his needs, then his needs are the limit of his appropriation.

*Appeal from District Court, Sweet Grass County; Sydney Sanner, Judge.*

ACTION by E. N. Bailey and others against Nicolas Tintinger, the Glass-Lindsay Land Company, and others. From a decree fixing the rights of the parties, the Glass-Lindsay Land Company appeals. Reversed and remanded.

*Messrs. Hartman & Hartman,* for Appellant, submitted a brief. *Mr. Charles S. Hartman* argued the cause orally.

We contend that the record clearly shows that the capacity of appellant's canal is largely in excess of the 1,430 miner's

inches, and that it is, under the law, entitled to have decreed to it the right to the use of a quantity of water, in addition to the amount decreed, equal to the difference between 1,430 miner's inches and the carrying capacity of the canal. This is the only question sought to be presented by this appeal. The rule by which the capacity of a ditch or canal is to be determined is announced in Pomeroy on Riparian Rights, section 81. (See, also, *White* v. *Todd's Valley Water Co.,* 8 Cal. 443, 68 Am. Dec. 338, 4 Morr. Min. Rep. 536.)

In the case of *Simmons* v. *Winters,* 21 Or. 35, 28 Am. St. Rep. 727, 27 Pac. 7, the court quotes with approval from section 47, Pomeroy on Riparian Rights: "To make a valid appropriation of water, there must be some actual beneficial purpose, existing at the time, or contemplated in the future, as the object for which the water is utilized." To the same effect, see *Atchison* v. *Peterson,* 20 Wall. (U. S.) 514, 22 L. Ed. 414. (See, also, *Ortman* v. *Dixon,* 13 Cal. 38; *Barnes* v. *Sabron,* 10 Nev. 217; *Hindman* v. *Rizor,* 21 Or. 120, 27 Pac. 13.) In *Nevada Ditch Co.* v. *Bennett,* 30 Or. 59, 60 Am. St. Rep. 777, 45 Pac. 472, it is held: "The *bona fide* intention which is required of the appropriator to apply the water to some useful purpose may comprehend a use to be made by or through another person, and upon lands and possessions other than those of the appropriator." (See, also, *Nevada Ditch Co.* v. *Canyon etc. Co.,* 58 Or. 517, 114 Pac. 86.) A most clear and comprehensive statement of the law applicable to this case will be found in the note to *Nevada Ditch Co.* v. *Bennett,* 60 Am. St. Rep. 816.

In Wiel on Water Rights, third edition, section 1265, the distinction between water "appropriated" for private purposes and for the purposes of sale, rental or distribution is made in the following words: "Concerning the use of the word 'appropriated' in this section, the California court has held that it means any setting apart or devotion of the waters to the purpose of sale, rental or distribution." (Citing *Hildreth* v. *Montecito etc. Co.,* 139 Cal. 23, 72 Pac. 395; *Mahoney* v. *American L. & W. Co.,* 2 Cal.

App. 185, 83 Pac. 267; *Merrill* v. *Southside Irr. Co.,* 112 Cal. 426, 44 Pac. 720; see, also, *Seaweard* v. *Pacific etc. Co.,* 49 Or. 157, 88 Pac. 963.)   Mr. Wiel, in section 483, says: "The essence of the rule is that the design [of the appropriator] may be carried out in spite of an intervening appropriation elsewhere on the stream.   The same doctrine has been applied to future enlargements of use for power purposes as well as irrigation."
(*Hubbs & Miner Ditch Co.* v. *Pioneer Water Co.,* 148 Cal. 407, 83 Pac. 253; *Trade Dollar etc. Co.* v. *Fraser,* 148 Fed. 587, 79 C. C. A. 37; *Union Min. Co.* v. *Dangberg,* 81 Fed. 73; see also, *Lobdell* v. *Simpson,* 2 Nev. 274, 90 Am. Dec. 537; *Ortman* v. *Dixon,* 13 Cal. 34; *Nevada Co.* v. *Kidd,* 37 Cal. 283; *Kidd* v. *Laird,* 15 Cal. 163, 76 Am. Dec. 472, 4 Morr. Min. Rep. 571; *Irwin* v. *Phillips,* 5 Cal. 140, 63 Am. Dec. 113, 15 Morr. Min. Rep. 178.)

The appropriations of appellant and its predecessors were completed within a reasonable time, and its ability and willingness to supply water to consumers on application was equivalent to actual application on the lands.   There is no arbitrary rule determining what is a reasonable time.   The circumstances of each case must be considered.   In *Rodgers* v. *Pitt* (Nev.), 129 Fed. 932, the court held thirteen years to be a reasonable time to complete the application of water.   In *Hall* v. *Blackman,* 8 Idaho, 272, 68 Pac. 19, fourteen years was held reasonable. Appellant's appropriation comes within the law as announced in *Becker* v. *Marble Creek etc. Co.,* 15 Utah, 225, 49 Pac. 892, 1119, wherein the court says: "The future needs must have been in mind at the time the appropriation was originally made, and not a mere afterthought."

The courts of California, under constitutional and statutory provisions similar to ours, have in numerous cases recognized the rights of companies thus organized to appropriate, hold and sell the waters of the streams of that state, and at the same time have defined their duties in the matter of supplying the same to consumers desiring to use the same.   (See *Price* v. *Riverside Land & Irr. Co.,* 56 Cal. 431; *Crow* v. *San Joaquin*

*K. R. Canal & Irr. Co.,* 130 Cal. 309, 62 Pac. 562, 1058; *Merrill* v. *South Side Irr. Co.,* 112 Cal. 426, 44 Pac. 720–723.)

The right of the company being a dual one, first, to supply water to its own lands, and, second, to lands owned by others, its right to sell and dispose of the irrigable lands now owned by it to others, and then to supply water to the purchasers of said lands, and to all consumers who may apply, is certainly within the law. The Act of Congress of July 26, 1866, authorizes appropriations of water for the useful purposes claimed by appellant. (*Broder* v. *Water Co.,* 101 U. S. 274, 25 L. Ed. 790, 5 Morr. Min. Rep. 33.) "It is settled by all the authorities that the use of water for irrigation when distributed by an irrigating company is a public use." (Long on Irrigation, sec. 4; *Fallbrook Irr. Dist.* v. *Bradley,* 164 U. S. 112; 41 L. Ed. 369, 17 Sup. Ct. Rep. 56; *Atlantic Trust Co.* v. *Woodbridge Canal & Irr. Co.,* 79 Fed. 39; *San Diego Flume Co.* v. *Souther,* 90 Fed. 164, 32 C. C. A. 548; *Lindsay Irr. Co.* v. *Mehrtens,* 97 Cal. 676, 32 Pac. 802; *Paxton* v. *Hershy Irr. etc. Co.* v. *Farmers' etc. Co.,* 45 Neb. 884, 50 Am. St. Rep. 585, 29 L. R. A. 853, 64 N. W. 343; *Umatilla Irr. Co.* v. *Barnhart,* 22 Or. 389, 30 Pac. 37.)

In behalf of Respondents, there was a brief by *Messrs. Miller & O'Connor; Mr. Jas. F. O'Connor* argued the cause orally.

We contend, first, that the amount of water allowed to appellant must be determined by the number of inches put to a beneficial use by it, which contention is supported by all recent court decisions respecting this problem. (1 Wiel on Water Rights, secs. 478, 479, and cases therein cited.) If this court adheres to the above rule, the largest amount of water that could, under any circumstances, be decreed to the appellant would be 1,150 inches, which included the water used upon the old Wormser ranch, known herein as the Asbury *et al.* right, and the trial court has already decreed to the appellant a number of inches in excess of this amount. Consequently, we do not think that the appellant is in a position to complain.

But to assume that the law is to the effect, as is claimed by counsel for appellant, that the number of inches of water to which this appellant is entitled must be governed by the carrying capacity of the ditch, as it was originally taken out, then the appellant is in no better position than it now is, should this court adhere to the rule above set forth, for the reason that the evidence, to say the least, is conflicting upon the size of the canal, and that the trial court has allowed to the appellant the full carrying capacity of the ditch, particularly so before it was enlarged in the summer of 1910, after a period of seventeen years having elapsed from the time of its completion. Now, even if the ditch had only a carrying capacity of the amount of water already decreed to it before it was enlarged, the trial court could not allow the appellant its carrying capacity after it was so enlarged after such a period of time had elapsed. No court has gone so far as to hold seventeen years a reasonable time within which to prosecute with diligence the work of the completion of an irrigation ditch. (1 Wiel on Water Rights, secs. 382, 383.) In section 484 of the same work are found instances where the courts have declared to be reasonable and unreasonable lengths of time. It has been held that the time during which a colonization company was seeking to induce immigration is a reasonable time. In *Nevada Ditch Co.* v. *Bennett,* 30 Or. 59, 60 Am. St. Rep. 777, 45 Pac. 472, five years have been held too long. (See, also, *Seaweard* v. *Pacific Co.,* 49 Or. 157, 88 Pac. 963, ten years held unreasonable; *Hindman* v. *Rizor,* 21 Or. 120, 27 Pac. 13; *Cole* v. *Logan,* 24 Or. 304, 33 Pac. 568; *Hough* v. *Porter,* 51 Or. 318, 95 Pac. 732, 98 Pac. 1083, 102 Pac. 728; thirteen years held unreasonable in *Low* v. *Rizor,* 25 Or. 551, 37 Pac. 82.) Our statute and the California statute with reference to the prosecution of the work with diligence is practically the same. At least, this court has said in the case of *Murray* v. *Tingley,* 20 Mont. 266, 50 Pac. 723, 19 Morr. Min. Rep. 137, that there is no distinction between the California water right Code and our own. The California supreme court, in the case of *Smith* v. *Hawkins,* 110 Cal. 122, 42 Pac. 453, holds that five

years is the limit of time within which to get the water on the land and use it. This case has been followed recently by the supreme court, and has been approved frequently by other courts. So it would seem that without a doubt the appellant, letting such a time elapse as it did between the date of the completion of its ditch in the year 1893, and the time of its attempted enlargement in 1910, did not exercise the diligence that the law requires in such cases. The reason why this should be the law is stated in the case of *Nevada C. & S. Co.* v. *Kidd,* 37 Cal. 282.

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

This suit was brought to have determined the relative rights of the parties to the use of the waters of Big Timber creek and its tributaries. The trial court found that 1,430 miner's inches of the waters of the North fork of Big Timber creek had been appropriated through the Big Timber creek canal and this quantity it ordered distributed: 430 inches to Asbury *et al.,* and 1,000 inches to the Glass-Lindsay Land Company. From the decree and an order denying a new trial, the Glass-Lindsay Land Company appealed.

In 1892, Lee, Hall, and Hatch filed notice of appropriation of 5,000 inches of water of Big Timber creek and commenced the construction of a distributing system. This work was continued in 1893. In 1894 Hatch succeeded to the interests of Hall and Lee, and continued the work to such an extent that small quantities of water were used during 1894 through the main canal. The appropriation made by Lee, Hall, and Hatch was for the purpose of irrigating lands upon which they had some claim, as well as to sell, rent, and otherwise distribute water to other persons. In June, 1895, A. Wormser succeeded to the rights of Hatch. About this time the Holland Irrigation Canal Company was organized under the laws of the state to purchase or construct a canal system upon the North fork of Big Timber creek to irrigate lands lying in the vicinity, and to

sell, rent, or otherwise dispose of water for irrigation and other lawful purposes.   Immediately thereafter this canal company succeeded to the rights of Wormser, except as to a particular right which need not be considered at this time.   During 1895 and 1896 the canal company prosecuted the work of extending the main ditch or canal, until it was completed substantially and was from eight to ten miles long.   By mesne conveyance the Glass-Lindsay Land Company, a corporation, became the owner of whatever rights had been acquired by the Holland Irrigation Canal Company, and in the latter part of May, 1910, did considerable work on one section of the canal.   The Glass-Lindsay Land Company was also organized under the laws of this state, with authority to purchase or construct an irrigation system and to sell, rent, or otherwise dispose of water for the irrigation of lands lying immediately tributary to this main canal.   At the time of the trial of this case, in December, 1910, something more than 1,000 acres of land had been subjected to irrigation from this canal, and there are substantially 3,450 acres more arid land which can be irrigated from it.   In 1908 the Glass-Lindsay Land Company furnished to its customers 835 inches of water; in 1909 it furnished 926 inches; and in 1910, 1,150 inches.   By reason of having succeeded to the particular right reserved by Wormser, Asbury *et al.* are entitled to 430 inches of water, and entitled to have it conveyed through this canal for a distance of about two miles, to the head of the Big Timber canal lateral, which thence conveys the water to lands owned by Asbury *et al.*

The trial court did not make any specific findings of fact. There is one general finding in which the court made a tabulation of the appropriators, the date and amount of each person's appropriation, and made its decree to conform thereto.   In doing so it awarded to the Glass-Lindsay Company 1,000 inches, of date December 20, 1892.

The argument of appellant company is that the finding of the court and the decree so limiting its rights are not supported by the evidence.   Respondents contend, among other things, that

the work done by the appellant company in 1910 amounted to an enlargement of the canal, as distinguished from repairs or cleaning it out. A. Zuill, a witness for appellant, was in charge of the work done in 1910. He testified that he had fifteen to seventeen teams and from twenty-five to thirty men at work; that they "cleaned out" a section of the canal 3,300 feet in length; that before this work was done the canal had a carrying capacity of from 1,200 to 1,500 inches, and after the work was done its capacity was 2,200 inches; that while nominally 1,150 inches of water only were supplied to customers of appellant during the season of 1910, in fact each customer received 150 per cent of the amount to which he was entitled, or 1,725 inches of water were actually supplied through the canal; and that it would have carried 500 inches more. John D. McLeod, an engineer, measured the canal in September, 1910. He found the capacity, from the head of the canal to the point where the Big Timber canal lateral leaves it, to be 2,200 inches. George Cardoza testified that he measured the canal on May 19, 1910, and found its capacity to be 1,240 inches. Fred Quinnell testified that he assisted Cardoza, and he likewise found the capacity of the canal to be 1,240 inches. He testified that after he and Cardoza made their measurement, Zuill and his men enlarged the canal by the work which they did in 1910. Bert Plaggemeyer testified that a certain flume near the head of the canal would not carry over 1,500 inches, and by reason of this the capacity of the canal, which otherwise would have exceeded that amount, was limited to 1,500 inches; but he further testified that the flume was out of repair, that it leaked and had a sag in it, and that it had been in that condition for two years. There is not any evidence in the record as to the capacity of this flume when completed or when in a state of repair to perform the service it was intended to perform.

Apparently there is not any controversy over the carrying capacity of the canal below the point where the Big Timber canal lateral leaves it, and it is apparent from the record that all of the witnesses were referring to its capacity from the head

to this particular point, except the witness McLeod, who also gave testimony as to the capacity at seven different places, four of which are below the head of the lateral. Respondents insist that there is a sharp conflict in the evidence, as to the capacity of the canal, and therefore appellant must assume the burden of showing that the evidence preponderates against the trial court's finding, assuming that the trial court impliedly found that the capacity of the canal was only 1,000 inches, or 1,430 inches including the Asbury *et al.* rights. The rule invoked is well recognized and is controlling if the record justifies its application; but so far as the evidence produced by the witnesses Zuill, Cardoza, and Quinnell, as to the capacity of the canal prior to the time the work was done in 1910 is concerned, there is not any conflict whatever. On the contrary, there is substantial agreement that at that particular time the capacity was 1,240 inches. If there is any conflict as to the carrying capacity of the canal after that work was done, it arises as between the testimony of Zuill and McLeod, on the one hand, that the capacity of the canal after that work was done was 2,200 inches, and the testimony of Plaggemeyer and one Kleinhesselink, on the other. So far as Plaggemeyer's testimony is concerned, it is not of any considerable consequence.

An appropriator's right is not to be limited by the capacity [1] of his canal while out of repair, unless that condition has existed for such length of time as to indicate an intention on the part of the appropriator to claim no more water than the canal in that condition will carry. The witness Kleinhesselink testified that he measured the canal and found its capacity to be 1,200 inches. Asked when he made the measurement, his reply was, "Last November." He was testifying some time near the middle of December, 1910. If by the use of the words "last November" he referred to November, 1910, then there is a direct conflict in the evidence. But counsel for appellant argue that it is quite apparent that the witness referred to November, 1909. If there was not anything else in the record to reflect upon the witness' meaning other than the terms which

he employed, we would feel forced to adopt the terms literally, and say that "last November," from the standpoint of December, 1910, means November, 1910.

But if such construction of the language leads to an absurdity, then it ought not to be adopted. If the witness referred to November, 1910, then the trial court refused to believe him, for it will not be presumed that the court awarded water rights aggregating 1,430 inches through a canal that will carry but 1,200 inches. If the witness referred to November, 1910, he made his measurement after the work was done in May of that year, and the canal thus had a less carrying capacity after the work was done than it had before. Finally, if the witness referred to November, 1909, then his testimony is in substantial agreement with that of the other witnesses, Cardoza, Quinnell, and Zuill, who measured it before the work of 1910 was done. These considerations seem conclusive that the witness must have referred to November, 1909, and, if so, then there is not any substantial conflict in the evidence, and it is apparent that the trial court must have found that the canal had a capacity of 1,240 inches before the work of 1910 was done, and a capacity of 2,200 inches after that date, if the flume mentioned above when in repair had that capacity. A different finding would not have any evidence whatever to support it. The trial court must have found that appellant's predecessors complied with the law in posting notice at the point of diversion, in filing the notice with the county clerk and recorder, and in doing the excavation work to completion with reasonable diligence as required by statute, for it applied the rule of relation and fixed its appropriation as of the date when the notice was posted at the point of diversion, a conclusion which could not have been reached upon any other theory. The court must have found, also, that the main canal had the same carrying capacity at the time it was completed in 1895 or 1896, as it had at the time of the trial, for this would be in accordance with the evidence, which is not disputed. Again, the court must have found that the work done on the canal in 1910 was not an enlargement

but amounted only to repairs or clearing out accumulated débris; otherwise the court would be in the absurd position of awarding to this canal considerably more water than it had capacity to carry. As said above, the court must have found that, when completed, the canal had a carrying capacity of 2,200 inches, or such less amount as the flume mentioned would carry at that [2] time, if in a state to perform its full service. The right of an appropriator to make repairs, so that his canal will perform the full service which it was intended to perform, is recognized generally, and is not controverted upon this appeal. It thus becomes apparent that the size of the canal, its carrying capacity, or appellant's needs was not a determining factor with the lower court in fixing the limit of appellant's appropriation.

From the evidence in the record it appears that about December 20, 1892, the predecessors of this appellant posted the required notice, claiming 5,000 inches of water; that they complied with the statute in filing the notice in commencing, prosecuting, and completing the work on the ditch; that the ditch when completed had a capacity of 2,200 inches, if the flume mentioned would carry that amount; and under section 4848, Revised Codes, the excess claimed over that amount was relinquished and the claim itself limited to 2,200 inches, or to the capacity of the flume if less than that amount. It further appears that at the time the claim was initiated there were arid lands susceptible of irrigation from this ditch, in extent sufficient to require the entire 2,200 inches and more. It further appears that the original claimants and their successors initiated the right and prosecuted it for the purpose of supplying water to irrigate these available lands. Apparently some of these lands, at least, were public lands, and as settlers have come upon them and have made demands for the water the same has been supplied. The quantity required at the time the ditch was completed was comparatively small. But the demands have increased as the lands were settled upon or cultivated, until, during 1910, 1,150 inches were required and furnished. The question, then, arises:

When, if at all, did appellant make an appropriation and what was the extent of such appropriation, if made? The trial court applied the rule of relation back, and fixed the date of appellant's appropriation as of the date of posting the notice. There is not any fault found with this portion of the decree, and could not be. So that, the court having found that appellant and its predecessors made a valid appropriation of date December 20, 1892, the only question remaining for solution is: What was the extent of that appropriation? And the answer to this involves a consideration of much, if not all, of the law of water appropriation.

It is quite well known that the law itself had its origin in the customs of miners and others in California. These customs had ripened into well-recognized rules some considerable time before there was organized local government in that country and before there was any legislation upon the subject whatever, and these customs were subsequently recognized as having the force of law, by state and national legislation and by the decisions of courts. (*Woolman* v. *Garringer*, 1 Mont. 535; *Jennison* v. *Kirk*, 98 U. S. 453, 25 L. Ed. 240; *Broder* v. *Water Co.*, 101 U. S. 274, 25 L. Ed. 790.) These customs formed a part of our unwritten law, or, as it might more aptly be termed, the common law of this country as distinguished from the common law of England. (*King* v. *Edwards*, 1 Mont. 235; *Jennison* v. *Kirk*, above; Carter's The Law, Its Origin, Growth and Function.)

In 1870 our legislature passed an Act (Laws 1869–70, p. 57) which apparently undertook to limit the right to appropriate water for irrigation purposes to persons or corporations having title to, or possession of, agricultural lands. (*Tucker* v. *Jones*, 8 Mont. 225, 19 Pac. 571.) The Act recognized the rights acquired or to be acquired under the rules and customs of the early settlers; but there was not any attempt made to prescribe any other method by which such rights might be secured. By an Act of February, 1877, the right of a person or association of persons or a corporation to appropriate water to sell, rent,

or otherwise dispose to others was authorized. In 1885, however, there was a distinct departure made by the legislature in enacting a statute under the title, "An Act relating to Water Rights." These several Acts were carried forward in the compilation of 1887,. as Chapter 74, Fifth Division, Compiled Statutes, and with some modifications into the Civil Code of 1895, as Title VIII, Division II, Part IV·; and again, with slight amendments and additions, into the Revised Codes of 1907, as sections 4840–4891, and now constitute the law of appropriation of water so far as controlled by legislation. As respects the method to be pursued by the intending appropriator proceeding under the statute, there has not been any substantial change made since the original Act of 1885 went into effect. We are of the opinion that there are, then, two distinct periods in the history of our water right law. The first comprises the time from the earliest settlement to 1885, during which period the rights were determined exclusively by the rules and customs of settlers; and the second extends from 1885 to the present time. As the rights of this appellant arose since 1885, we are not concerned with the rules of law applicable to the first period, except so far as they may reflect upon the legislation in force during the second period.

Our Act of 1885 is in all substantial particulars a copy of the California Act of March 21, 1872. The California Act was called in question in *De Necochea* v. *Curtis,* 80 Cal. 397, 20 Pac. 563, 22 Pac. 198, in a contest between De Necochea, who claimed an appropriation of water, and Curtis, who claimed as riparian owner. De. Necochea had diverted the water from a stream and actually applied it to beneficial uses after the statute of 1872 went into effect, but he did not comply with the statute by posting notice, *etc.,* or make any attempt to do so. He had however, actually used the water before Curtis settled upon the riparian land. The only question before the court was whether a valid appropriation could be made after 1872 without complying with the statute. The conclusion of the court was that such an appropriation could be made, that the mode pre-

scribed by the statute was not exclusive, but that the right acquired by compliance with the rules and customs of the early settlers was fully recognized by the statute. (Cal. Civ. Code, sec. 1419 [sec. 4849, Mont. Rev. Codes].) After quoting section 1418 of the California Civil Code, the court said: "In this provision we begin to see the purpose and object of the legislature, which, in our opinion, was merely to define with precision the conditions upon which the appropriator of water could have the advantage of the familiar doctrine of relation." In a case involving similar facts and the same question, the court approved that decision and quoted the language above, in *Burrows* v. *Burrows*, 82 Cal. 564, 23 Pac. 146. A similar question arose thereafter between one claimant who had diverted and actually used the water but had not complied with the statute, and another claimant who subsequently made an appropriation by complying with the statute. The same conclusion was reached and again the language above was quoted, and in addition the court said: "The scope and purpose of all the provisions of the chapter upon water rights was to establish a procedure for the claimants of the right to the use of water, whereby a certain definite time might be established as the date at which their title should accrue." (*Wells* v. *Mantes*, 99 Cal. 583, 34 Pac. 324.) In Kerr's Encyclopedic Code of California, under section 1418, Civil Code, above, the annotator says: "Purpose and object of the legislature in requiring compliance with sections 1415 and 1416 is clearly to define with precision conditions upon which appropriator of water could have all advantages of familiar doctrine of relation"—and in support of his statement cites the three preceding cases.

In *Murray* v. *Tingley*, 20 Mont. 260, 50 Pac. 723, this court had before it the single question: Can a person make a valid appropriation of water after the statute of 1885 went into effect, without complying with the statute? After citing *De Necochea* v. *Curtis* and *Wells* v. *Mantes*, and quoting the language from the former opinion which we reproduce above, this court said: "We think the construction of the statute by the supreme court

of California is logical and correct, and are of the opinion that the Montana Act [of 1885] should be construed in the same manner." That the conclusion reached by the California court in each of those cases, as well as the conclusion of this court in *Murray* v. *Tingley,* is correct, does not admit of argument. Section 1419, California Civil Code (Mont. Rev. Codes, sec. 4849), clearly recognizes a right which one may acquire to the use of water without complying with the statute, and that such right shall be good as against everyone except an appropriator who complies with the statute before the first claimant has actually completed his work and applied the water to a beneficial use. In the course of the opinion in *Murray* v. *Tingley,* Mr. Justice Buck, speaking for the court, said: "In enacting this law the legislature did not contemplate that one who failed to comply with the terms of the statute, but who, in the absence of any conflicting adverse right, had nevertheless actually diverted water and put it to a beneficial use, should acquire no title thereby. The essence of an appropriation—a completed ditch, actually diverting water, and putting it to a beneficial use—remained the same as it had been before." Keeping in mind the single question before the court, the language above: "The essence of an appropriation—a completed ditch, actually diverting water, and putting it to a beneficial use—remained the same as it had been before," must have been intended to apply to one who after 1885 seeks to make an appropriation without complying with the statute, and thus construed we agree with the statement entirely. The learned justice further said: "The object of the statute was to preserve evidence of rights, and also to regulate the doctrine of relation back." As applied to the facts of that case, this statement is also correct. We think that the California court was not attempting to state the only purposes of these water right statutes in the quotations above from *De Necochea* v. *Curtis* and *Wells* v. *Mantes,* or that Mr. Justice Buck meant that the only purpose of our legislation was and is to preserve evidence of rights and regulate the doctrine of relation. Those statements must be read in the light of the facts

of the particular cases and the question for decision; and, thus read, they are correct even though they may be, in a sense, *dicta,* as it would seem to have been entirely unnecessary for either court to make any pronouncement upon the subject in order to reach a conclusion in harmony with the spirit and purpose of the law.   A much more apt statement is that made by the annotator quoted above.

But we are of the opinion that by enacting the statute of 1885, and in carrying it forward into the several compilations since, our legislature had in mind a purpose in addition to those stated by the California court and by Mr. Justice Buck in *Murray* v. *Tingley,* above.   That purpose was to prescribe the steps necessary to be taken to effect a complete appropriation of water. This is manifest from the statute itself.   It specifies certain acts which must be done, and then concludes by saying: If you perform these acts, your right relates back to the date of posting notice.   What right?   The right to the use of water.   (Sec. 4849.)   But a valid subsisting right implies a completed appropriation, and necessarily so.   It would be absurd and contrary to the very terms of the statute to say that before you have a completed appropriation you have secured a right to the use of water which relates back to some preceding date.   The right of an appropriator to use water depends upon his appropriation of it.   In *Maeris* v. *Bicknell,* 7 Cal. 262, 68 Am. Dec. 257, the court said: "Until such actual appropriation there can exist no complete right to the use of water, for the party may never carry out his intention."   And though Mr. Long insists that actual use is a necessary prerequisite to a completed appropriation, he nevertheless announces the following as the doctrine of relation: "The rights of an appropriator of water do not become absolute until the appropriation is completed by the actual application of the water to the use designed; but where he has pursued the work of appropriation with due diligence, and brought it to completion within a reasonable time, as against other appropriators, his right will relate back to the time of the commencement of the work."   (Sec. 51.)   But our

statutes declare that the right accrues upon the completion of the ditch, canal, or other means of diversion, and it must be upon the theory that the appropriation is then complete, and this is the view entertained by Pomeroy. (Black's Pomeroy on Water Rights, secs. 54, 55.)

The doctrine of relation was recognized before the statutes were enacted; but the point of time to which the right then related was the time when work was commenced upon the ditch, canal, or other means of diversion. (*Woolman* v. *Garringer*, 1 Mont. 535.) We doubt whether a party could ever invoke the doctrine of relation until his appropriation was completed; and we are led irresistibly to the conclusion that, before the [3] statute makes applicable the doctrine, a completed appropriation must have been effected.

After referring to the conflicting views expressed by the courts, and as if to emphasize the views we have announced, as well as to point out the difficulties which the contrary theory will necessarily create, Mr. Wiel says: ''In appropriations for future use (which are generally upheld if *bona fide*), also, this divergence of views will probably cause difficulty. The original theory, considering the appropriation complete on completion of the construction work and diversion (the taking of possession of the water), necessitates the enforcement of the doctrine of relation from that time; whereas, when the acquisition of the right is delayed until actual application, it will keep open and uncertain for years (under frequent decisions) the doubt whether an appropriation exists, as some states allow years to pass (if a reasonable time) before the application need be made; and after those years of uncertainty, will cut off the intervening rights of other claimants.'' (1 Wiel on Water Rights in the Western States, sec. 396.)

We are of the opinion that the Act of 1885 intended: (1) To preserve the right which the appropriator had theretofore; and (2) to provide an additional method of making an appropriation. In other words, during the first period of our history above, there was but one method of making an appropriation,

and that was by complying with the rules and customs of the pioneer settlers; while during the period since 1885, two distinct methods are prescribed,—the first by complying with the rules and customs of the early settlers, and the second by complying with the terms of the statute. We imagine that the members of the bench and bar of this state would be very much surprised if told at this late day that an appropriation of water cannot be made by pursuing the method prescribed by statute.

Speaking of an appropriation after the statute of 1872 was enacted in California, Wiel, volume 1, section 364, says: "An appropriation may be made by a complete, actual diversion for a beneficial purpose, without following the statute, or else by proceeding under the statute. * * * These two are the only methods. Unless there is a right by actual diversion as below set forth, or by compliance with the statute, it cannot be spoken of as an appropriation."

In *Senior* v. *Anderson*, 115 Cal. 496, 47 Pac. 454, the court says: "In the absence of the statutory notice, an appropriation can only be made by its actual diversion and use."

In *Lower Tule R. Ditch Co.* v. *Angiola Water Co.*, 149 Cal. 496, 86 Pac. 1081, the court, speaking through Mr. Justice Shaw, said: "In order to make a valid appropriation it was not necessary for Duncan to post and record a notice of appropriation as provided in the Civil Code (secs. 1415–1421). The method of acquiring a right to the use of water as there prescribed is not exclusive. One may by a prior actual and completed appropriation and use, without proceeding under the Code, acquire a right to the water beneficially used, which will be superior and paramount to the title of one making a subsequent appropriation from the same stream in the manner provided by that statute."

In each of these decisions there is a very clear recognition of two distinct methods of appropriating water since the enactment of the statute upon the subject, as we have outlined above. We are satisfied that the statutory method of making an appropriation is entirely distinct from the method which may be pursued under the rules and customs of the early settlers; and,

furthermore, that the statute provides for all the steps
[4] necessary to be taken by one who follows them, to secure a
completed appropriation. Those steps are: (1) Posting notice.
(2) Filing notice with the county clerk and recorder. (Sec.
4847.) (3) Commencing work within forty days after posting
notice. (4) Prosecuting such work with reasonable diligence.
And (5) actual completion of the work. (Sec. 4848.) These
are all the requirements of the Code, and by what authority shall
any additional exaction be made? "The Code establishes the
law of this state respecting the subjects to which it relates."
(Sec. 6214.) Our conclusion is in entire harmony with the
theory of appropriation as shown by the history of its origin,
growth, and purpose; and if our conclusion is not correct, then
there is not any such thing as an appropriation of water, under
or by virtue of the statute. Either the statute provides a com-
plete mode of acquiring the right to use water by appropriation,
or it does not prescribe any at all.

In support of our view, we quote, from 1 Wiel on Water
Rights in the Western States, the following: "Historically, an
appropriation was simply the taking possession of the stream,
so that diversion was the last step in such possession and the
last step in completing the appropriation." (Sec. 395.) "The
rules developed in the early days upon the public lands in Cali-
fornia still prevail in California substantially as laid down in
the early decisions of the court. The proposition around which
these rules center is, it should be repeated, that the requisites
are those furnishing an equivalent to taking possession of the
flow of the water; the right having arisen as a possessory right
on the public domain." (Sec. 362.) "The law of appropria-
tion arose as a branch of the law of possessory rights upon the
public domain. It hence took on the attributes of a posses-
sory system. The method of making an appropriation was de-
duced from the requisite, of obtaining possession of the stream.
Actual use was not a prerequisite to the creation of the right
and to invoking the doctrine of relation; actual diversion was
enough, if with *bona fide* intent. * * * Actual use was rep-

resented only by a *bona fide* intention; it did not have to be immediately accomplished to create a right; but the flow could be held for future needs; nonuse was immaterial unless it was accompanied with an actual intent to permanently abandon the possession.'' (Sec. 139.)

In proceeding under the rules and customs of the early settlers, whether before or since the enactment of the statute, the intending appropriator must take actual possession of the water; but from one who proceeds under the statute, actual use of the water cannot be exacted as a prerequisite to a completed appropriation. The statute does not require it, but, on the contrary, makes provision, compliance with which is the equivalent of actual possession. We quote again from 1 Wiel, section 362, as follows: ''Having found water that can be appropriated and a proper place to appropriate it, the right to the water is not complete until the water is actually taken into one's possession, or rather, until all work preparatory to the actual use of the water is completed, since that is the equivalent of taking possession; it is the nearest to possession that the nature of the right makes possible.'' Upon the theory thus advanced, the claimant who proceeds under the statute, and performs the acts required as set forth above, has a completed appropriation of water upon the completion of the work on his ditch, canal, or other means of diversion, even before the water is actually applied to a beneficial use. The correctness of this view, we think, is emphasized by consideration of the opposing doctrine. In Colorado it is held that actual application of the water to a beneficial use is a necessary prerequisite of a completed appropriation, and this doctrine is followed in some of the other states. Our Act of 1877, above, specifically recognized the right of an individual to appropriate water to rent or sell to another; but if the Colorado doctrine be invoked here, such individual could never make his appropriation, for, under the Colorado theory, the user and not the first individual would be the appropriator, and this is the only consistent position to assume, if actual use is a necessary step to a completion of the appropriation. But such a position

is inconsistent with our Act of 1877, which was carried forward in the compilation of 1887 as section 1263, into the Codes of 1907, as section 4860. In Oregon it would seem that under the rule there recognized, as applied to the supposed case above, the original claimant is dependent upon the volition of his customer, a third person, and one a stranger to his enterprise, to complete his appropriation by the application of the water to actual use.

While the Act of 1870, above, sought to limit the right to appropriate water for irrigation to persons or corporations owning or in possession of agricultural lands, the provision was omitted advisedly from the Codes of 1895 and 1907, and it has [5] since been held that the appropriator need not be either an owner or in possession of land in order to make a valid appropriation for irrigation purposes. (*Toohey* v. *Campbell*, 24 Mont. 13, 60 Pac. 396; *Smith* v. *Denniff*, 24 Mont. 20, 81 Am. St. Rep. 408, 50 L. R. A. 74, 60 Pac. 398.) Again, Article III, section 15, of the Constitution of Montana provides: "The use of all water now appropriated, or that may hereafter be appropriated for sale, rental, distribution or other beneficial use * * * shall be held to be a public use." Section 3808, Revised Codes, authorizes the formation of a corporation to supply water to the public; while section 3819 gives further recognition to the same right. Section 4841 declares that the appropriation must be for some useful or beneficial purpose; but the use to which the water is to be applied need not be immediate, but [6] may be prospective or contemplated. (*Toohey* v. *Campbell,* above; *Miles* v. *Butte Electric & Power Co.,* 32 Mont. 56, 79 Pac. 549; *Smith* v. *Duff*, 39 Mont. 382, 133 Am. St. Rep. 587, 102 Pac. 984.)

Assume that a corporation which does not own, control, or possess any land is organized for the purpose of selling or renting water to settlers to irrigate arid lands; that it proceeds under the statute to make its appropriation and fully complies with all the statutory requirements, completes its distributing system, and is ready and offers to supply water to settlers upon demand. Now, if the corporation can ever make an appropriation, it has

done so, for it has performed every act which it can perform. It cannot use the water itself, for it has no land or other means of use. Any further acts must be performed by its customers who are to be the users. Under such circumstances, the Colorado court, insisting upon actual use as a necessary prerequisite to a valid appropriation, holds that the corporation is not an appropriator at all, but that its customers become the appropriators of the several quantities of water which they use (1 Wiel, sec. 396; 2 Wiel, sec. 1338) ; and this seems the only logical conclusion if actual use is necessary to complete the appropriation. But such a result is a denial of the right of the corporation to make an appropriation, a result which cannot be reached in this state, where our Constitution and laws specifically recognize the right of a corporation to make an appropriation, unaided by the acts of third parties. There may be lands available for irrigation at the time the corporation's system is completed; but the corporation cannot compel people to utilize their lands, and, if they do, it cannot compel them to use its water. If the appropriation is not completed until the water is actually used, it is apparent at once that the corporation's right, if any it has, is so intangible and uncertain as to be of no value, whatever amount of money may have been expended on the work. If the land sought to be reclaimed should be government land, the corporation would be confronted with the additional difficulty that it cannot compel people to settle upon such lands, and its appropriation would depend upon the tide of immigration and the wishes of the settlers when they do come in, if use is necessary to complete the appropriation.

In the note to *Nevada Ditch Co.* v. *Bennett* (30 Or. 59, 45 Pac. 472), as reported in 60 Am. St. Rep. 777, the author reviews the history of our water right law as disclosed in the decided cases, and upon the particular question now under consideration says: "The appropriation of water for sale to others is authorized by the statutes of the states in which it is valuable for that purpose, and in many instances the chief, and even the sole, object of an appropriator is not that of any use by him in and

upon his own lands or mines, but the sale of the water to others who have mines to be worked or lands to be irrigated. In cases of appropriation for the purpose of supplying water to others, we do not understand how it can be said that the use of the water is an essential element of its appropriation. If the intended appropriator constructs the works and appliances necessary for the diversion of the water and the carrying of it to points where its use is desirable and profitable, and has actually carried it there, or is ready and willing to do so, and offers it to all persons who are willing to pay for its use, we apprehend that his appropriation is complete, though the persons to whom it is thus offered refuse to receive or use it. They certainly cannot thus defeat the rights of the diverter.''

To deny the right of a public service corporation to make an appropriation independently of its present or future customers. and to have a definite time fixed at which its right attaches, would be to discourage the formation of such corporations and greatly retard the reclamation of arid lands in localities where the magnitude of the undertaking is too great for individual enterprise, if, indeed, it would not defeat the object and purpose of the United States in its great reclamation projects, for the United States must proceed in making appropriations of water (from the non-navigable streams of this state at least) as a corporation or individual. (Rev. Codes, sec. 4846; *United States* v. *Burley* (C. C.), 172 Fed. 615; *Burley* v. *United States,* 179 Fed. 1, 102 C. C. A. 429.)

It is clearly the public policy of this state to encourage these public service corporations in their irrigation enterprises, and the courts should be reluctant to reach a conclusion which would militate against that policy.

It is impossible to harmonize the decisions of the courts upon the subjects presented. Respectable authority can be found holding contrary to our view; but upon a consideration of our statutes, the history of the law of appropriation, and the public policy of this state, we base our conclusion that, as to a public [7] service corporation, its appropriation is complete when it

45 Mont.—12

has fully complied with the statute and has its distributing system completed and is ready and willing to deliver water to users upon demand, and offers to do so. The right thus obtained may be lost by abandonment or nonuser for an unreasonable time (1 Wiel, sec. 569), but cannot be made to depend for its existence in the first instance upon the voluntary acts of third parties—strangers to its undertaking. The appellant here is a public service corporation (*State ex rel. Milsted* v. *Butte City W. Co.,* 18 Mont. 199, 56 Am. St. Rep. 575, 32 L. R. A. 697, 44 Pac. 966; *Gutierres* v. *Albuquerque L. & I. Co.,* 188 U. S. 545, 47 L. Ed. 588, 23 Sup. Ct. Rep. 338; 2 Wiel, sec. 1260), as were its immediate predecessors, while the original appropriators of the right claimed by appellant were private individuals.

If our statute does not by express terms, it does by fair [8] implication, require that, at the time of taking the initial steps, the claimant must have an intention to apply the water to a useful or beneficial purpose. (*Power* v. *Switzer,* 21 Mont. 523, 55 Pac. 32; *Toohey* v. *Campbell,* above; *Miles* v. *Butte Electric & Power Co.,* above; *Smith* v. *Duff,* above.) The law will not encourage anyone to play the part of the dog in the manger, and therefore the intention must be *bona fide* and not a mere afterthought. (*Nevada County & S. C. Co.* v. *Kidd,* 37 Cal. 282.)

The appropriator's need and facilities, if equal, measure the [9] extent of his appropriation. (*Sayre* v. *Johnson,* 33 Mont. 15, 81 Pac. 389.) If his needs exceed the capacity of his means of diversion, then the capacity of ditch, *etc.,* measures the extent of his right. (*McDonald* v. *Lannen,* 19 Mont. 78, 47 Pac. 648.) If the capacity of his ditch exceeds his needs, then his needs measure the limit of his appropriation. (*Toohey* v. *Campbell,* above.)

We find, then, from this record that, at the time of the initiation of appellant's right in 1892, there was a useful and beneficial purpose to which the water to be appropriated could be applied; that Lee, Hall, and Hatch were qualified to make an appropriation; that they had the *bona fide* intention at the time

to apply the water, which they sought to appropriate, to a useful and beneficial purpose; that they posted the required notice at the point of diversion, filed the notice with the county clerk and recorder within the time required by law, commenced the work of constructing the canal by which the water was to be diverted, within the period limited by the statute; that they and their successor, the Holland Irrigation & Canal Company, prosecuted the work with reasonable diligence and completed it by 1895 or 1896, which, considering the magnitude of the undertaking, was within a reasonable time; that the notice posted and the one filed for record claimed more than 2,200 inches; that the canal, when completed, had a carrying capacity of 2,200 inches, or such less amount as the flume mentioned herein would carry if that amount was less than 2,200 inches; that the lands available for irrigation under the canal would require the amount claimed; and that, upon completion, the canal company was in a position to offer, and did offer, the water to actual and prospective users—and these questions are not to be retried. Upon the other questions involved the evidence is too indefinite to enable us to make final disposition of the cause.

Upon the facts stated, our conclusion is that the appropriation was actually completed upon the completion of the canal; that the right related back to the date when the notice was posted; that a valid appropriation of 2,200 inches, or such less amount as the flume would carry, was made; and that this appellant is entitled to a decree for that amount, unless the whole or a portion of the original appropriation has been lost by abandonment or nonuser for an unreasonable length of time.

It appears that the cause was determined upon an erroneous theory, and, in justice to all parties concerned, the judgment and order refusing a new trial should be reversed, and the cause remanded for a new trial as to appellant's right as indicated above, and it is accordingly so ordered.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE SMITH concur.