# UNITED STATES *v.* GERLACH LIVE STOCK CO.

NO. 4.

Argued March 1, 1949.—Reargued March 29–30, 1950.—Decided June 5, 1950.

*Ralph S. Boyd* argued the cause for the United States. With him on the briefs were *Solicitor General Perlman,*

*Assistant Attorney General Vanech* and *Roger P. Marquis. Robert L. Stern* was also with them on the brief on the original argument and *Stanley M. Silverberg* was also with them on the brief on the reargument.

*Edward F. Treadwell* argued the cause for respondents. With him on the brief was *Reginald S. Laughlin. Samuel I. Jacobs* was also of counsel for Potter, respondent in No. 5.

By special leave of Court, *Warner W. Gardner* argued the cause for Gill et al., as *amici curiae,* urging affirmance. With him on the brief on the original argument was *Milton T. Farmer* and with him on the brief on the reargument was *A. E. Chandler.*

An *amici curiae* brief, urging affirmance, was filed on behalf of the States of California, by *Fred N. Howser,* Attorney General, *Arvin B. Shaw, Jr.,* Assistant Attorney General, *Gilbert F. Nelson,* Deputy Attorney General, and *Northcutt Ely;* Idaho, by *Robert E. Smylie,* Attorney General; Kansas, by *Edward F. Arn,* Attorney General; Nebraska, by *James H. Anderson,* Attorney General; Nevada, by *Alan Bible,* Attorney General; New Mexico, by *Joe L. Martinez,* Attorney General; North Dakota, by *Nels G. Johnson,* Attorney General; Oregon, by *George Neuner,* Attorney General; South Dakota, by *Sigurd Anderson,* Attorney General; and Washington, by *Smith Troy,* Attorney General.

*Harry W. Horton, W. R. Bailey* and *Arvin B. Shaw, Jr.* filed a brief for the Irrigation Districts Association of California, as *amicus curiae,* urging affirmance.

MR. JUSTICE JACKSON delivered the opinion of the Court.

We are asked to relieve the United States from six awards by the Court of Claims as just compensation for deprivation of riparian rights along the San Joaquin River

in California caused by construction of Friant Dam, and its dependent irrigation system, as part of the Central Valley Project.

This is a gigantic undertaking to redistribute the principal fresh-water resources of California. Central Valley is a vast basin, stretching over 400 miles on its polar axis and a hundred in width, in the heart of California. Bounded by the Sierra Nevada on the east and by coastal ranges on the west, it consists actually of two separate river valleys which merge in a single pass to the sea at the Golden Gate. Its rich acres, counted in the millions, are deficient in rainfall and must remain generally arid and unfruitful unless artificially watered.

Water resources there are, if they can be captured and distributed over the land. From the highland barricade at the north the Sacramento River flows southerly, while from the Yosemite region at the southeast the San Joaquin River winds northeasterly until the two meet and consort in outlet to the sea through estuaries that connect with San Francisco Bay. These dominating rivers collect tribute from many mountain currents, carry their hoardings past parched plains and thriftlessly dissipate them in the Pacific tides. When it is sought to make these streams yield their wasting treasures to the lands they traverse, men are confronted with a paradox of nature; for the Sacramento, with almost twice the water, is accessible to the least land, whereas about three-fifths of the valley lies in the domain of the less affluent San Joaquin.

To harness these wasting waters, overcome this perversity of nature and make water available where it would be of greatest service, the State of California proposed to re-engineer its natural water distribution. This project was taken over by the United States in 1935 and has since been a federal enterprise. The plan, in broad outline, is to capture and store waters of both rivers and many of their tributaries in their highland basins, in some

cases taking advantage of the resulting head for generation of electric energy. Shasta Dam in the north will produce power for use throughout much of the State and will provide a great reservoir to equalize seasonal flows of the Sacramento. A more dramatic feature of the plan is the water storage and irrigation system at the other end of the valley. There the waters of the San Joaquin will be arrested at Friant, where they would take leave of the mountains, and will be diverted north and south through a system of canals and sold to irrigate more than a million acres of land, some as far as 160 miles away. A cost of refreshing this great expanse of semiarid land is that, except for occasional spills, only a dry river bed will cross the plain below the dam. Here, however, surplus waters from the north are utilized, for through a 150-mile canal Sacramento water is to be pumped to the cultivated lands formerly dependent on the San Joaquin.

Both rivers afford navigation—the Sacramento for a considerable distance inland, the San Joaquin practically only at tidewater levels. The plan will have navigation consequences, principally on the Sacramento; but the effects on navigation are economically insignificant as compared with the values realized from redistribution of water benefits.

Such a project inevitably unsettles many advantages long enjoyed in reliance upon the natural order, and it is with deprivation of such benefits that we are here concerned.

Claimants own land parcels riparian to the San Joaquin.[1] These are called "uncontrolled grass lands," to distinguish them from either crop lands or "controlled grass lands," both of which have long been irrigated through controlled systems supplied from the stream.

---

[1] Claimants' rights are subject to certain prior appropriative and other rights which do not affect the issues before us.

Neither of these latter will be injured by the diversion, for they are to be provided with the replacement water from the Sacramento.

Uncontrolled grass lands involved in the claims are parts of a large riparian area which benefits from the natural seasonal overflow of the stream. Each year, with predictable regularity, the stream swells and submerges and saturates these low-lying lands. They are moistened and enriched by these inundations so that forage and pasturage thrive, as otherwise they can not. The high stage of the river, while fluctuating in height and variable in arrival, is not a flood in the sense of an abnormal and sudden deluge. The river rises and falls in rhythm with the cycle of seasons, expansion being normal for its time as curtailment is for others, and both are repeated with considerable constancy over the years. It should be noted, however, that claimants' benefit comes only from the very crest of this seasonal stage, which crest must be elevated and borne to their lands on the base of a full river, none of which can be utilized for irrigation above and little of it below them. Their claim of right is, in other words, to enjoy natural, seasonal fluctuation unhindered, which presupposes a peak flow largely unutilized.

The project puts an end to all this. Except at rare intervals, there will be no spill over Friant Dam, the bed of the San Joaquin along claimants' lands will be parched, and their grass lands will be barren. Unlike the supply utilized for nearby crop and "controlled" lands, the vanishing San Joaquin inundation cannot be replaced with Sacramento water. Claimants have been severally awarded compensation for this taking of their annual inundations, on the theory that, as part of the natural flow, its continuance is a right annexed to their riparian property. 111 Ct. Cl. 1, 89, 76 F. Supp. 87, 99. The principal issues are common to the six cases in which we granted certiorari. 335 U. S. 883.

## I. NAVIGATION OR RECLAMATION PROJECT?

The Solicitor General contends that this overall project, and each part of it, has been authorized by Congress, under the commerce power, as a measure for control of navigation. Claimants on the other hand urge that although improvement of navigation was one objective of the Central Valley undertaking as a whole, nevertheless construction of the Friant Dam and the consequent taking of San Joaquin water rights had no purpose or effect except for irrigation and reclamation. This, it is claimed, was not only the actual, but the avowed purpose of Congress. On these conflicting assumptions the parties predicate contrary conclusions as to the right to compensation.

In the Rivers and Harbors Act of August 26, 1937, § 2, 50 Stat. 844, 850, and again in the Rivers and Harbors Act of October 17, 1940, 54 Stat. 1198, 1199–1200, Congress said that "the entire Central Valley project . . . is . . . declared to be for the purposes of improving navigation, regulating the flow of the San Joaquin River and the Sacramento River, controlling floods, providing for storage and for the delivery of the stored waters thereof . . . ." The 1937 Act also provided that "the said dam and reservoirs shall be used, first, for river regulation, improvement of navigation, and flood control . . . ."

But it also is true, as pointed out by claimants, that in these Acts Congress expressly "reauthorized" [2] a project

---

[2] "[T]he entire Central Valley project, California, heretofore authorized and established under the provisions of the Emergency Relief Appropriation Act of 1935 (49 Stat. 115) and the First Deficiency Appropriation Act, fiscal year 1936 (49 Stat. 1622), is hereby reauthorized . . . ." The latter reference is to a $6,900,000 appropriation primarily for "Friant Reservoir and irrigation facilities therefrom," as a reclamation project "reimbursable under the Reclamation Law." 49 Stat. 1597, 1622.

Development of the water resources of Central Valley was initiated by the State of California. Cal. Stat. (1933) 2643. Studies were

already initiated by President Roosevelt, who, on September 10, 1935, made allotment of funds for construction of Friant Dam and canals under the Federal Emergency Relief Appropriation Act, 49 Stat. 115, § 4, and provided that they "shall be reimbursable in accordance with the reclamation laws." [3]   A finding of feasibility, as required by law,[4] was made by the Secretary of the Interior on November 26, 1935, making no reference to navigation, and his recommendation of "the Central Valley development as a Federal reclamation project" was approved by the President on December 2, 1935.

When it "reauthorized" the Central Valley undertaking, Congress in the same Act provided that "the provisions

made of the feasibility of federal participation, and although there was no accompanying appropriation, the first congressional authorization in connection with the project was contained in the Act of Aug. 30, 1935, 49 Stat. 1028, 1038.   In this Act, on the representation of the Chief of Engineers that, as to the Friant Dam phase, "No benefits would accrue to navigation from this development," (House Doc. No. 191, 73d Cong., 2d Sess. 3; and see Comm. on Rivers and Harbors, H. R., Doc. No. 35) Congress limited its approval of federal participation to purely navigation works in the northern part of the valley, and authorized a federal expenditure of $12,000,000 in the construction of Kennett Dam on the Sacramento. When it "reauthorized" the entire project, Congress provided that, when appropriated, this $12,000,000 should be exempt from the reimbursement requirements of the reclamation law.   Act of Aug. 26, 1937, § 2, 50 Stat. 844, 850.

[3] The reference is to the Reclamation Act of 1902, 32 Stat. 388, as amended, 43 U. S. C. §§ 371 et seq.

[4] Act of June 25, 1910, § 4, 36 Stat. 835, 836, provides that no irrigation project contemplated under the Reclamation Act "shall be begun unless and until the same shall have been recommended by the Secretary of the Interior and approved by the direct order of the President of the United States."   To this was added the requirement that the Secretary "shall have made a finding in writing that it is feasible, that it is adaptable for actual settlement and farm homes, and that it will probably return the cost thereof to the United States."   Act of Dec. 5, 1924, § 4 (B), 43 Stat. 672, 702.

of the reclamation law,[5] as amended, shall govern the repayment of expenditures and the construction, operation, and maintenance of the dams, canals, power plants, pumping plants, transmission lines, and incidental works deemed necessary to said entire project, and the Secretary of the Interior may enter into repayment contracts, and other necessary contracts, with State agencies, authorities, associations, persons, and corporations, either public or private, including all agencies with which contracts are authorized under the reclamation law, and may acquire by proceedings in eminent domain, or otherwise, all lands, rights-of-way, water rights, and other property necessary for said purposes: . . . ."

The Central Valley basin development envisions, in one sense, an integrated undertaking, but also an aggregate of many subsidiary projects, each of which is of first magnitude. It consists of thirty-eight major dams and reservoirs bordering the valley floor and scores of smaller ones in headwaters. It contemplates twenty-eight hydropower generating stations. It includes hundreds of miles of main canals, thousands of miles of laterals and drains, electric transmission and feeder lines and substations, and a vast network of structures for the control and use of water on two million acres of land already irrigated, three million acres of land to be newly irrigated, 360,000 acres in the delta needing protection from intrusions of salt water, and for municipal and miscellaneous purposes including cities, towns, duck clubs and game refuges. These projects are not only widely separated geographically, many of them physically independent in operation, but they are authorized in separate acts from year to year and are to be constructed at different times over a considerable span of years. A formula has been approved by the President by which multiple purpose dams are the

---

[5] See n. 3, *supra*.

responsibility of the Bureau of Reclamation, and dams and other works only for flood control are exclusively the responsibility of the Army Engineers.[6]  The entire Friant and San Joaquin projects at all times have been administered by the Bureau of Reclamation.

We cannot disagree with claimants' contention that in undertaking these Friant projects and implementing the work as carried forward by the Reclamation Bureau, Congress proceeded on the basis of full recognition of water rights having valid existence under state law.  By its command that the provisions of the reclamation law should govern the construction, operation, and maintenance of the several construction projects, Congress directed the Secretary of the Interior to proceed in conformity with state laws, giving full recognition to every right vested under those laws.[7]  *Cf. Nebraska* v. *Wyoming,* 295 U. S. 40, 43; *Power Co.* v. *Cement Co.,* 295 U. S. 142, 164; *Nebraska* v. *Wyoming,* 325 U. S. 589, 614; *Mason Co.* v. *Tax Comm'n,* 302 U. S. 186.  In this respect, Congress' action parallels that in *Ford & Son* v. *Little Falls Fibre Co.,* 280 U. S. 369.  The original plan called

---

[6] Letter of President Truman to the Secretary of the Interior, dated August 15, 1949, S. Doc. No. 113, 81st Cong., 1st Sess.

[7] The Reclamation Act of 1902, 32 Stat. 388, as amended, 43 U. S. C. §§ 371 *et seq.,* to which Congress adverted, applies only to the seventeen Western States.  Section 8 provides:

"That nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof: . . . ."

To the extent that it is applicable this clearly leaves it to the State to say what rights of an appropriator or riparian owner may subsist along with any federal right.

for purchase of water rights and included an estimate of their cost.[8]   We are advised by the Government that at least throughout administration of California reclamation projects it has been the consistent practice of the Bureau of Reclamation to respect such property rights.   Such has specifically been the Bureau's practice in connection with the Friant project, and this has been reported to Congress,[9] which has responded some nine times in the past

[8] "Part of the water supply is to be obtained by the purchase of water now used for the irrigation of pasture lands and this will result in the retirement from use of 250,000 acres of submarginal land . . . ." Feasibility Report, Secretary of the Interior Ickes to President Roosevelt, Nov. 26, 1935.   Included in the Secretary's estimated costs of the project was an item of $8,000,000 for "rights of way, water rights and general expense." *Ibid.* In the Act of Aug. 26, 1937, the Secretary was authorized to acquire "by proceedings in eminent domain, or otherwise, all lands, rights-of-way, water rights, and other property necessary for said purposes: . . . ."   50 Stat. 844, 850.

[9] In administering the Central Valley Project, the Bureau of Reclamation submitted appropriation requests regularly from 1938 through 1949.   On each occasion, excepting fiscal year 1945, Congress was advised that San Joaquin water rights were being purchased, and every appropriation request but three (fiscal years 1941, 1945, and 1946) included an item for such water rights.   Hearings, Subcomm. of the House Comm. on Appropriations, Interior Dept., 75th Cong., 1st Sess. 281, 282 (except as noted, all following references are to hearings before this subcommittee),. and see H. R. Rep. No. 786, 75th Cong., 1st Sess. 14; Hearings, 75th Cong., 3d Sess. 349, and see H. R. Rep. No. 1855, 75th Cong., 3d Sess. 14; Hearings, 76th Cong., 1st Sess. 421, 422, and see H. R. Rep. No. 161, 76th Cong., 1st Sess. 16; Hearings, 76th Cong., 3d Sess. 495, and see H. R. Rep. No. 1709, 76th Cong., 3d Sess. 14; Hearings, 77th Cong., 1st Sess. 741; Hearings, 77th Cong., 2d Sess. 434–439; Hearings, Pt. 1, 78th Cong., 1st Sess. 1174; Hearings, Pt. 1, 79th Cong., 1st Sess. 1200; Hearings, Pt. 2, 79th Cong., 2d Sess. 315–317; Hearings, Pt. 3, 80th Cong., 1st Sess. 749–752; Hearings, Pt. 3, 80th Cong., 2d Sess. 1214, 1279–1280, and see Hearings, Subcomm. of the Senate Comm. on Appropriations, Interior Dept., 80th Cong., 2d Sess. 921–924; 50 Stat. 564, 597; 52 Stat. 291, 324; 53 Stat. 685, 719; 55 Stat. 303, 336; 56 Stat. 506, 536; 57 Stat. 451, 476; 60 Stat. 348, 367; 61 Stat. 460, 475; 62 Stat. 1112, 1129.

twelve years to requests for appropriations to meet such expenses. We think this amounts, not to authorizations and declarations creating causes of action against the United States, but to awareness and approval of administrative construction. We think it clear that throughout the conception, enactment and subsequent administration of the plan, Congress has recognized the property status of water rights vested under California law.

It is not to be doubted that the totality of a plan so comprehensive has some legitimate relation to control of inland navigation or that particular components may be described without pretense as navigation and flood control projects. This made it appropriate that Congress should justify making this undertaking a national burden by general reference to its power over commerce and navigation.

The Government contends that the overall declaration of purpose is applicable to Friant Dam and related irrigation facilities as an integral part of "what Congress quite properly treated as a unit." Adverting to *United States* v. *Willow River Co.*, 324 U. S. 499; *United States* v. *Commodore Park*, 324 U. S. 386; *United States* v. *Appalachian Power Co.*, 311 U. S. 377; *United States* v. *Chandler-Dunbar Co.*, 229 U. S. 53, the Government relies on the rule that it does not have to compensate for destruction of riparian interests over which at the point of conflict it has a superior navigation easement the exercise of which occasions the damage. And irrespective of divisibility of the entire Central Valley undertaking, the Government contends that Friant Dam involves a measure of flood control, an end which is sensibly related to control of navigation. *Oklahoma* v. *Atkinson Co.*, 313 U. S. 508.

Claimants, on the other hand, urge that at least the Friant Dam project was wholly unrelated to navigation ends and could not be controlled by the general Congressional declaration of purpose. They point out that, al-

though definitions of navigation have been expanded, *United States* v. *Appalachian Power Co., supra,* in every instance in which this Court has denied compensation for deprivation of riparian rights it has specifically noted that the federal undertaking bore some positive relation to control of navigation. *United States* v. *Willow River Co., supra,* 510; *United States* v. *Commodore Park, supra,* 391; *United States* v. *Appalachian Power Co., supra,* 423; *United States* v. *Chandler-Dunbar Co., supra,* 62; and cases cited. And, referring to *International Paper Co.* v. *United States,* 282 U. S. 399; *United States* v. *River Rouge Co.,* 269 U. S. 411, and cases cited, they observe that this Court has never permitted the Government to pervert its navigation servitude into a right to destroy riparian interests without reimbursement where no navigation purpose existed.

Since we do not agree that Congress intended to invoke its navigation servitude as to each and every one of this group of coordinated projects, we do not reach the constitutional or other issues thus posed. Accordingly, we need not decide whether a general declaration of purpose is controlling where interference with navigation is neither the means, *South Carolina* v. *Georgia,* 93 U. S. 4, nor the consequence, *United States* v. *Commodore Park, supra,* of its advancement elsewhere. Similarly, we need not ponder whether, by virtue of a highly fictional navigation purpose, the Government could destroy the flow of a navigable stream and carry away its waters for sale to private interests without compensation to those deprived of them. We have never held that or anything like it, and we need not here pass on any question of constitutional power; for we do not find that Congress has attempted to take or authorized the taking, without compensation, of any rights valid under state law.

On the contrary, Congress' general direction of purpose we think was intended to help meet any objection to its

constitutional power to undertake this big bundle of big projects. The custom of invoking the navigation power in authorizing improvements appears to have had its origin when the power of the Central Government to make internal improvements was contested and in doubt. It was not until 1936 that this Court in *United States* v. *Butler,* 297 U. S. 1, declared for the first time, and without dissent on this point, that, in conferring power upon Congress to tax "to pay the Debts and provide for the common Defence and general Welfare of the United States," the Constitution delegates a power separate and distinct from those later enumerated, and one not restricted by them, and that Congress has a substantive power to tax and appropriate for the general welfare, limited only by the requirement that it shall be exercised for the common benefit as distinguished from some mere local purpose. If any doubt of this power remained, it was laid to rest the following year in *Helvering* v. *Davis,* 301 U. S. 619, 640. Thus the power of Congress to promote the general welfare through large-scale projects for reclamation, irrigation, or other internal improvement, is now as clear and ample as its power to accomplish the same results indirectly through resort to strained interpretation of the power over navigation.[10] But in view of this background we think that reference to the navigation power was in justification of federal action on the whole, not for effect on private rights at every location along each component project.

---

[10] See Feasibility Report, Secretary of the Interior Ickes to President Roosevelt, Nov. 26, 1935, recommending "the approval of the Central Valley development as a Federal reclamation project," and pointing out that the area is served by excellent transportation facilities, that much of its produce is shipped to eastern markets, and that if decreasing productivity as a result of acute shortage of water for irrigation needs were to continue, "a share of the loss will be suffered by persons not residing in the areas directly affected."

Even if we assume, with the Government, that Friant Dam in fact bears some relation to control of navigation, we think nevertheless that Congress realistically elected to treat it as a reclamation project. It was so conceived and authorized by the President and it was so represented to Congress. Whether Congress could have chosen to take claimants' rights by the exercise of its dominant navigation servitude is immaterial. By directing the Secretary to proceed under the Reclamation Act of 1902, Congress elected not "to in any way interfere with the laws of any State . . . relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder." 32 Stat. 388, 390.

We cannot twist these words into an election on the part of Congress under its navigation power to take such water rights without compensation. In the language of Mr. Justice Holmes, writing for the Court in *International Paper Co.* v. *United States,* 282 U. S. 399, 407, Congress "proceeded on the footing of a full recognition of [riparians'] rights and of the Government's duty to pay for the taking that [it] purported to accomplish." We conclude that, whether required to do so or not, Congress elected to recognize any state-created rights and to take them under its power of eminent domain.[11]

We are guided to this conclusion by the interpretation placed on Congress' Acts by the Reclamation Bureau, which, in administering the project, has at all times pursued a course impossible to reconcile with present contentions of the Government. From the be-

---

[11] This approach makes it unnecessary to consider the relevancy of *United States* v. *Hotel Co.,* 329 U. S. 585; *United States* v. *Goltra,* 312 U. S. 203; *Tillson* v. *United States,* 100 U. S. 43, on the question of claimants' right to interest. Unless we choose to disturb these cases we could not limit ourselves to saying that by invocation of the Reclamation Act of 1902 Congress simply assumed liability for claimants' water rights.

ginning, it has acted on the assumption that its Friant undertaking was a reclamation project. Even a casual inspection of its committee hearings and reports leaves no doubt that Congress was familiar with and approved this interpretation. Although the Solicitor General contends that, because of the navigation purpose remotely involved, deprivation of water rights along the San Joaquin is not compensable, we have observed that the plan as originally adopted and as carried out by the Bureau included replacement at great expense of all water formerly used for crops and "controlled grass lands" and purchase of that used on marginal pasture lands.[12] It has consistently advised the Congress that it was purchasing San Joaquin water rights and appropriations have been made accordingly.[13] Moreover, Congress [14] and the water users [15] have been advised that, in prosecution of the work, existing water rights would be respected.

[12] See n. 8, *supra.*

[13] See n. 9, *supra.*

[14] "In conducting irrigation investigations and constructing and operating projects throughout the West, the Bureau of Reclamation fully recognizes and respects existing water rights established under State law. Not only is this a specific requirement of the Reclamation Act under which the Bureau operates, but such a course is the only fair and just method of procedure. This basin report on the Central Valley is predicated on such a policy." Report of Regional Director, Region II, Bureau of Reclamation, Dec. 1, 1947, approved by the Secretary of the Interior, July 29, 1948, S. Doc. No. 113, 81st Cong., 1st Sess. 39.

[15] After consultation with the Commissioner of Reclamation and the Secretary of the Interior, the Regional Director, Region II, Bureau of Reclamation, replied to questions concerning the Central Valley Project submitted by the Irrigation Districts Association of California:

"The Bureau of Reclamation does recognize and respect existing water rights which have been initiated and perfected or which are in the state of being perfected under State laws. The Bureau of Reclamation has been required to do so by Section 8 of the Reclamation Act of 1902 ever since the inception of the reclamation pro-

This administrative practice has been extended even to the lands in question. Pursuant to its plan, the Bureau offered to purchase the rights of claimants in Nos. 7, 8 and 9, but the parties could not agree on the price. In addition, it entered into a written contract with Miller & Lux, Inc., purchasing for $2,450,000 riparian rights which included some identical with those the Government now denies to exist. In fact it includes the very rights now asserted by claimants Gerlach, Erreca and Potter, who obtained title to their riparian properties from Miller & Lux. Because of certain reservations in their grants, it was possible that Miller & Lux retained the rights riparian to these properties. The Government therefore agreed with Miller & Lux that the sum of $511,350 should be deposited with an escrow agent. If final judgments obligate the United States to make compensation to Miller & Lux grantees for such riparian grass lands, the United States shall be reimbursed from

gram administered by the Bureau of Reclamation. The Bureau of Reclamation has never proposed modification of that requirement of Federal law; and. on the contrary, the Bureau of Reclamation and the Secretary of the Interior have consistently, through the 42 years since the 1902 act, been zealous in maintaining compliance with Section 8 of the 1902 act. They are proud of the historic fact that the reclamation program includes as one of its basic tenets that the irrigation development in the West by the Federal Government under the Federal Reclamation Laws is carried forward in conformity with State water laws. Ample demonstration of the effect of this law and policy of administration, in action, has been given in connection with the Central Valley Project. Water filings made by the State have been obtained by the Bureau of Reclamation by assignment, and vested water rights have been acquired by the United States by purchase, the considerations amounting to millions of dollars and being agreeable to the vendors—all in conformity with State laws. Further, other water rights of landowners which will or may be affected by the operations of the project are being analyzed and appropriate adjustments, giving full recognition of the rights of the landowners, are in the process of being worked out."

the escrow fund in an amount not exceeding $9 per acre. However, if final judgments dismiss the claims, the escrowed funds go to Miller & Lux. The substance of this strange transaction is that the Government, which now asks us to hold that there are no such riparian rights, has already bought and paid for them at the price which the Court of Claims has allowed. The results of the Government's bargain are that, if we hold there are no rights, Miller & Lux will be paid for them; and, if we hold there are such rights, they will be paid from what otherwise goes to Miller & Lux. As to these three cases, the Government is defending against the claims, not as the real party in interest, but because it undertook to do so on behalf of Miller & Lux.

Of course, this Court is not bound by administrative mistakes. If the Government had contracted to pay for rights which are nonexistent, it would not preclude us from upholding later and better advised contentions. But when a project has been regarded by the highest Executive authorities as a reclamation project, and has been carried as such from its initiation to final payment for these rights, and Congress, knowing its history, has given the approvals that it has, we think there is no ground for asking us to hold that the provisions of the Reclamation Act do not apply. We hold that they do apply and we therefore turn, as that Act bids us, to the laws of the State to determine the rights and liabilities of landowner and appropriator.

## II. CLAIMANTS' RIPARIAN RIGHTS UNDER CALIFORNIA LAW.

The adversaries in this case invoke rival doctrines of water law which have been in competition throughout California legal history. The claims are expressly based on common-law riparian-rights doctrines as declared by California courts. The United States, on the other hand,

by virtue of the Reclamation Act, stands in the position of an upstream appropriator for a beneficial use.

The governing water law of California must now be derived from a 1928 Amendment to its Constitution [16] which compresses into a single paragraph a reconciliation and modification of doctrines evolved in litigations that have vexed its judiciary for a century. Its text leaves many questions to be answered, and neither it nor any legislation or judicial decision provides a direct and explicit determination of the present state law on issues before us. But since the federal law adopts that of the State as the test of federal liability, we must venture a conclusion as to peculiarly local law. We can do so only in the

---

[16] That amendment added Art. XIV, § 3 of the State Constitution, which provides:

"It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which his land is riparian under reasonable methods of diversion and use, or of depriving any appropriator of water to which he is lawfully entitled. This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained."

light of a long history of strife and doctrinal conflict, which
California says must be known by every judge of these
matters, *Conger* v. *Weaver,* 6 Cal. 548, and in continuity
with which both the cryptic text of the Amendment and
the policy of federal statutes become more intelligible.[17]

Upon acquiring statehood in 1850, California adopted
the common law of England as the rule of decision in
its courts when not inconsistent with the Federal or
State Constitutions or State legislation.  In the middle
of the Eighteenth Century, English common law included
a body of water doctrine known as riparian rights.   That
also was the general Mexican law, if it had any lingering
authority there, but see *Boquillas Cattle Co.* v. *Curtis,* 213
U. S. 339, 343; *Gutierres* v. *Albuquerque Land Co.,* 188
U. S. 545, 556, except for a peculiar concession to
"pueblos."   Indeed, riparian-rights doctrines prevailed
throughout Western civilization.

As long ago as the Institutes of Justinian, running wa-
ters, like the air and the sea, were *res communes*—things
common to all and property of none.   Such was the doc-
trine spread by civil-law commentators and embodied

[17] The historical background of both riparian and appropriative
rights, the relevant local history and the legislative history of the
Act of 1866 are comprehensibly set forth in 1 Wiel, Water Rights
in the Western States §§ 66 to 264 (3d ed., 1911), and in the following
articles by the same author: *Public Policy in Water Decisions,* 1 Calif.
L. Rev. 11; *Comparative Water Law,* 6 Calif. L. Rev. 245, 342;
*Political Water Rights,* 10 Calif. L. Rev. 111; *Theories of Water
Law,* 27 Harv. L. Rev. 530.  See also Pomeroy on Water Rights,
cc. 2, 3 (1893); 3 Farnham, Waters and Water Rights, c. 22; Toelle,
*Prospective Effect on Western Water Law of Proposed Federal Mis-
souri Valley and Columbia Valley Authorities,* 20 Temple L. Q. 425;
Walton, *Origin and Growth of Western Irrigation Law,* 21 Ill. L.
Rev. 126; Bannister, *Federal Disposition of Waters in the Priority
States,* 28 Harv. L. Rev. 270; Lasky, *From Prior Appropriation
to Economic Distribution of Water by the State—Via Irrigation
Administration,* 1 Rocky Mt. L. Rev. 161.

in the Napoleonic Code and in Spanish law. This conception passed into the common law. From these sources, but largely from civil-law sources, the inquisitive and powerful minds of Chancellor Kent and Mr. Justice Story drew in generating the basic doctrines of American water law.

Riparian rights developed where lands were amply watered by rainfall. The primary natural asset was land, and the run-off in streams or rivers was incidental. Since access to flowing waters was possible only over private lands, access became a right annexed to the shore. The law followed the principle of equality which requires that the corpus of flowing water become no one's property and that, aside from rather limited use for domestic and agricultural purposes by those above, each riparian owner has the right to have the water flow down to him in its natural volume and channels unimpaired in quality. The riparian system does not permit water to be reduced to possession so as to become property which may be carried away from the stream for commercial or nonriparian purposes. In working out details of this egalitarian concept, the several states made many variations, each seeking to provide incentives for development of its natural advantages. These are set forth in *Shively* v. *Bowlby*, 152 U. S. 1. But it may be said that when California adopted it the general philosophy of the riparian-rights system had become common law throughout what was then the United States.

Then in the mountains of California there developed a combination of circumstances unprecedented in the long and litigious history of running water. Its effects on water laws were also unprecedented. Almost at the time when Mexico ceded California, with other territories, to the United States, gold was discovered there and a rush of hardy, aggressive and venturesome pioneers began. If the high lands were to yield their treasure to

prospectors, water was essential to separate the precious from the dross. The miner's need was more than a convenience—it was a necessity; and necessity knows no law. But conditions were favorable for necessity to make law, and it did—law unlike any that had been known in any part of the Western world.

The adventurers were in a little-inhabited, unsurveyed, unowned and almost ungoverned country, theretofore thought to have little value. It had become public domain of the United States and miners regarded waters as well as lands subject to preemption. To be first in possession was to be best in title. Priority—of discovery, location and appropriation—was the primary source of rights. Fortuitously, along lower reaches of the streams there were no riparian owners to be injured and none to challenge customs of the miners.

In September, 1850, California was admitted to the Union as a State. In 1851, its first Legislature enacted a Civil Practice Act which contained a provision that "in actions respecting 'Mining Claims,' . . . customs, usages, or regulations, when not in conflict with the Constitution and Laws of this State, shall govern the decision of the action." [18] The custom of appropriating water thus acquired some authority, notwithstanding its contradiction of the common law. A practice that was law in the mountains was contrary to the law on the books. Here were provocations to controversy that soon came to the newly established state courts.

In California, as everywhere, the law of flowing streams has been the product of contentions between upper and lower levels. Thus when Matthew Irwin built a dam and canal on the upper San Joaquin for appropriating water to supply miners, downstream settler Robert Phillips tore

---

[18] Civil Practice Act of April 29, 1851, § 621. In substance now § 748, Code Civil Procedure.

it down and asserted his own riparian right to have the water descend to him in its natural volume. Faced with this issue between custom and doctrine, the California Supreme Court escaped by observing that both claims were located on public domain, and that neither party could show proprietorship. Accordingly, as between two mere squatters, priority of appropriation established the better right. But the court gave warning that this appropriative right might not prevail against a downstream riparian who claimed by virtue of proprietorship. *Irwin* v. *Phillips,* 5 Cal. 140 (1855).

The United States, as owner of the whole public domain, was such a proprietor, and the decision made appropriations vulnerable to its challenge. It also left the pioneers in position of trespassers. They were taught that the tenure of their preemptions and appropriations was precarious when, in 1858, the Attorney General of the United States intervened in private litigation to contend in federal court that the land in dispute was public, and asserted generally a right to restrain all mining operations upon public land. His intervention was successful, an injunction forbade working the mine in question, and a writ issued under the hand of President Lincoln directing military authorities to remove the miners. *United States* v. *Parrott,* 1 McAll. (C. C.) 271.

Demands of mining and water interests that the Federal Government relieve their uncertain status were loud, but went unheeded amidst the problems that came with civil war. But after the war closed, the issue was again precipitated by a bill introduced at the request of the Secretary of the Treasury to have the United States withdraw all mines from the miners, appraise and sell them, reserving a royalty after sale. This the Secretary believed would yield a large revenue and the public lands would help pay the public war debt. However, the private interests prevailed. The Act of July 26, 1866, 14

Stat. 251, R. S. § 2339, declared the mining lands free and open to preemption and included the following:

"That whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes aforesaid is hereby acknowledged and confirmed: *Provided, however,* That whenever, after the passage of this act, any person or persons shall, in the construction of any ditch or canal, injure or damage the possession of any settler on the public domain, the party committing such injury or damage shall be liable to the party injured for such injury or damage." 14 Stat. 251, 253, 43 U. S. C. § 661.

This section was expounded by Mr. Justice Field in *Jennison* v. *Kirk,* 98 U. S. 453, as foreclosing further proprietary objection by the United States to appropriations which rested upon local custom. This Court regarded the Act as "an unequivocal grant" for existing diversions of water on the public lands. *Broder* v. *Water Co.,* 101 U. S. 274. Thus Congress made good appropriations in being as against a later patent to riparian parcels of the public domain, and removed the cloud cast by adverse federal claims.

While this was being accomplished, changed conditions brought new adversaries to contend against the appropriators. The Homestead Act of 1862 had opened agricultural lands to preemption and set up a method of acquiring formal title. 12 Stat. 392. Farms and ranches appeared along the streams and wanted the protection that the common law would give to their natural flow.

The Act of 1866, as we have noted, made appropriators liable for damage to settlers with whose possession they interfered. The Supreme Court of California decided that a riparian owner came into certain rights which he could assert against a subsequent appropriator of the waters of the stream, even though he could not as against a prior appropriation. *Crandall* v. *Woods,* 8 Cal. 136.

In 1886 came the decisive battle of *Lux* v. *Haggin,* 69 Cal. 255, 10 P. 674. Haggin organized an irrigation company and claimed the right to appropriate the entire flow of the Kern River for irrigation and to destroy any benefits for riparian owners downstream. The court held that the doctrine of riparian rights still prevailed in California, that such right attached to riparian land as soon as it became private property and, while subject to appropriations made prior to that time, it is free from all hostile appropriations thereafter. Thus California set itself apart by its effort to reconcile the system of riparian rights with the system of appropriation, whereas other arid states rejected the doctrine of riparian rights forthrightly and completely.

The Twentieth Century inducted new parties into the old struggle. Gigantic electric power and irrigation projects succeeded smaller operations, and municipalities sought to by-pass intervening agricultural lands and go into the mountains to appropriate the streams for city supply. Increasing dependence of all branches of the State's economy, both rural and urban, upon water centered attention upon its conservation and maximum utilization.

This objective seemed frustrated by the riparian-rights doctrine when, in 1926, the California Supreme Court decided *Herminghaus* v. *Southern California Edison Co.,* 200 Cal. 81, 252 P. 607, and this Court, after argument, dismissed certiorari for want of a federal question, 275 U. S. 486 (1927). That case involved just such questions as we have here. Southern California Edison projected

a large storage of San Joaquin waters in the mountains primarily for power generation. Plaintiffs' ranch, like lands of claimants, had always been naturally irrigated by overflow and thus naturally was productive property. Appropriation by the power company threatened to impair this overflow and destroy the value of the ranch. The company was unwilling to compensate the damage. The court held that common law of riparian rights must prevail against the proposed utilization and, notwithstanding the economic waste involved in plaintiffs' benefit, enjoined the power project.

This ruling precipitated a movement for amendment of the State Constitution and thus brought to a focus a contest that had grown in bitterness and intensity throughout the arid regions as both populations and property values mounted. The doctrine of riparian rights was characterized as socialistic. Wiel, *Theories of Water Law,* 27 Harv. L. Rev. 530 (1914). The State Supreme Court said the law of appropriation would result in monopoly. *Lux* v. *Haggin, supra,* at 309, 10 P. at 703. If the uneconomic consequences of unlimited riparianism were revealed by court decisions, so the effects of unrestrained appropriation became apparent where the flow of rivers became completely appropriated, leaving no water for newcomers or new industry.[19]

A Joint Committee of the California Legislature gave extended study to the water problems of that State and careful consideration of many remedies. Among other

---

[19] Court opinions indicate that all the waters of the South Platte River have been appropriated and the entire normal flow of the river is inadequate to supply the priorities for irrigation purposes already decreed from it. *Comstock* v. *Ramsey,* 55 Colo. 244, 133 P. 1107. The entire Boise River in Idaho has been appropriated. *United States* v. *Burley,* 172 F. 615. Many Colorado streams are already overappropriated. *Humphreys T. Co.* v. *Frank,* 46 Colo. 524, 105 P. 1093. See Wiel, *Theories of Water Law,* 27 Harv. L. Rev. 530.

proposals, one relevant to our question was to revoke or nullify all common-law protection to riparian rights and do it retroactively as of the year 1850.[20] The Committee rejected all dispossession proposals as confiscatory. It reported an amendment to the Constitution which attempted to serve the general welfare of the State by preserving and limiting both riparian and appropriative rights while curbing either from being exercised unreasonably or wastefully. The Amendment was submitted to and adopted by the electors in November 1928 and now constitutes California's basic water law, to which the Federal Reclamation Act defers.

We cannot assume that this Amendment was without impact upon claims to water rights such as we have here, for, as we have seen, it was provoked by their assertion. Neither can we assume that its effect is to deprive riparian owners of benefits it declares to continue or unintentionally to strike down values there was a studied purpose to preserve. We are only concerned with whether it continued in claimants such a right as to be compensable if taken. But what it took away is some measure of what it left.

Riparianism, pressed to the limits of its logic, enabled one to play dog-in-the-manger. The shore proprietor could enforce by injunction his bare technical right to have the natural flow of the stream, even if he was getting no substantial benefit from it. This canine element in the doctrine is abolished. "The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, . . . ." This limitation is not trans-

---

[20] The legislative history of the Amendment is set forth in Wiel, *The Pending Water Amendment,* 16 Calif. L. Rev. 169 and 257, and see Wiel, *Europeanizing the State Constitution—The Water and Power Amendment,* 12 Calif. L. Rev. 454; Note, 1 Stanford L. Rev. 172.

gressed by the awards in question which only compensate for the loss of actual beneficial use. Any hazard to claimants' rights lurks in the following clause: "and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water." Since riparian rights attach to, and only to, so much of the flow of the San Joaquin as may be put to beneficial use consistently with this clause, claimants can enforce no use of wasteful or unreasonable character.

We assume for purposes of this decision that the prodigal use, inseparable from claimants' benefits, is such that the rights here asserted might not be enforced by injunction. But withholding equitable remedies, such as specific performance, mandatory orders or injunctions, does not mean that no right exists. There may still be a right invasion of which would call for indemnification. In fact, adequacy of the latter remedy is usually grounds for denial of the former.

But the public welfare, which requires claimants to sacrifice their benefits to broader ones from a higher utilization, does not necessarily require that their loss be uncompensated any more than in other takings where private rights are surrendered in the public interest. The waters of which claimants are deprived are taken for resale largely to other private land owners not riparian to the river and to some located in a different water shed. Thereby private lands will be made more fruitful, more valuable, and their operation more profitable. The reclamation laws contemplate that those who share these advantages shall, through water charges, reimburse the Government for its outlay. This project anticipates recoupment of its cost over a forty-year period.[21] No rea-

---

[21] The Feasibility Report of Secretary Ickes, *supra*, n. 8, referring to Friant Dam, Friant-Kern Canal and Madera Canal, among others included, says, "The next declaration required is that the cost of

son appears why those who get the waters should be spared from making whole those from whom they are taken. Public interest requires appropriation; it does not require expropriation. We must conclude that by the Amendment California unintentionally destroyed and confiscated a recognized and adjudicated private property right, or that it remains compensable although no longer enforcible by injunction. The right of claimants at least to compensation prior to the Amendment was entirely clear. Insofar as any California court has passed on the exact question, the right appears to survive.[22] Five years after the Amendment, the Superior Court of California [23] specifically sustained identical rights. The Madera Irrigation District had been organized to build a dam at the Friant site and to divert San Joaquin waters to irrigate about 170,000 acres. It was sued by Miller & Lux, Inc., and two of its subsidiaries, and decrees in their favor were entered in 1933. In general, the court sustained the Miller & Lux riparian rights to the annual overflow of uncontrolled grass lands, some of which now belong to

construction will probably be returned to the Federal Government. This is interpreted to mean that it will be returned within forty years from the time the Secretary issues public notice that water is available from the project works. The estimated cost of construction is $170,000,000 and the annual cost, including repayment of all other charges is $7,500,000. It is estimated that annual revenues from the sale of water and of electric power will be sufficient to cover these charges. The favorable conditions heretofore recited justify the belief that the project will return its cost."

[22] United States District Court, Southern District of California, rendered a decision on April 12, 1950, in *Rank* v. *Krug*, 90 F. Supp. 773, consistent with the views we take of the issues here involved.

[23] *Sacramento & San Joaquin Drainage District Co.* v. *Superior Court*, 196 Cal. 414, 432, 238 P. 687, 694. This is not a local court but a part of a system of state courts. It seems to fall within the rule of *Fidelity Trust Co.* v. *Field*, 311 U. S. 169, as a court whose decrees are regarded as determination of state law rather than within the rule of *King* v. *Order of Travelers*, 333 U. S. 153.

claimants. It adjudged the proposed appropriation invalid and ineffective as against those rights. In July of 1940 the United States acquired all of Madera's rights, including pending applications to appropriate San Joaquin water under state law. These judgments had become final and were outstanding adjudications of the issues here involved against a grantor of the United States. Without considering the claim that the 1933 judgments may be *res judicata,* they are at least persuasive that claimants' rights to the benefit had, in the opinion of California courts, survived the Amendment and must be retired by condemnation or acquisition before the Friant diversion could be valid.

The Supreme Court of California has given no answer to this specific problem. But in the light of its precedents and its conclusions and discussions of collateral issues, especially in *Peabody* v. *Vallejo,* 2 Cal. 2d 351, 40 P. 2d 486; *Lodi* v. *East Bay Municipal Utility District,* 7 Cal. 2d 316, 60 P. 2d 439; *Hillside Water Co.* v. *Los Angeles,* 10 Cal. 2d 677, 76 P. 2d 681; *Gin S. Chow* v. *Santa Barbara,* 217 Cal. 673, 22 P. 2d 5; *Meridian, Ltd.* v. *San Francisco,* 13 Cal. 2d 424, 90 P. 2d 537; *Los Angeles* v. *Glendale,* 23 Cal. 2d 68, 142 P. 2d 289, we conclude that claimants' right to compensation has a sound basis in California law. The reclamation authorities were apparently of that view as the Miller & Lux contract would indicate.

We recognize that the right to inundation asserted here is unique in the history of riparian claims. Where the thirst of the land is supplied by rainfall, floods are detriments if not disasters, and to abate overflows could rarely if ever cause damage. But, as we have pointed out, uncommon local conditions have given rise to the singular rule of California. The same scarcity which makes it advantageous to take these waters gives them value in the extraordinary circumstances in which the California

courts have recognized a private right to have no interception of their flow except upon compensation.

We think the awards of the Court of Claims correctly applied the law of California as made applicable to these claims by Congress.

### III. OTHER ISSUES.

The Government also assigns as error determination of the date from which interest is to be allowed. The Court of Claims adopted as the date of taking the first substantial impoundment of water which occurred on October 20, 1941, even though it had not then prevented benefits from reaching the property. The contract between the Government and Miller & Lux contemplated this as the date of taking, for it puts the $511,350 in escrow to protect the Government against suits "initiated prior to the sixth anniversary after the initial storage or diversion." Since the Government itself has adopted this date for the expiration of its protection by contract, we see no reason why it should challenge the Court of Claims for use of the same date for accrual of the claims. Regardless of how this might have been fixed in the absence of such an administrative determination, we decline to set aside the finding on this subject.

Second, the Government claims that the court below misconstrued reservations in the deeds between the three claimants and Miller & Lux. It is not apparent from the facts we have recited that the Government is the real party in interest as to this question, which seems to be in the nature of a private controversy between claimants and Miller & Lux. In any event, it presents a question of conveyancing and real property law peculiar to this one case, and depending on local law. It is not a question of general interest, nor is there any manifest error, and we accept, without review, the finding of the Court of Claims thereon.

Finally, the Government protests that the court below failed adequately to describe the rights taken for which it has made an award. We think in view of the simple nature of the claims, the exhaustive character of the findings and the understanding the Government must have acquired in seven years of the litigations, there is little prospect that it will be grievously misled by deficiencies, if any, that may exist in the description.

The judgments are

*Affirmed.*

MR. JUSTICE BLACK concurs in the judgment and opinion except that he agrees with MR. JUSTICE DOUGLAS that interest should not be allowed.

MR. JUSTICE DOUGLAS, concurring in part and dissenting in part.

I think it is clear under our decisions that respondents are not entitled to compensation as a matter of constitutional right. For we have repeatedly held that there are no private property rights in the waters of a navigable river. See *United States* v. *Appalachian Power Co.,* 311 U. S. 377, 424; *United States* v. *Commodore Park,* 324 U. S. 386, 390–391; *United States* v. *Willow River Co.,* 324 U. S. 499, 510. That is true whether the rights of riparian owners or the rights of appropriators are involved. See *Gibson* v. *United States,* 166 U. S. 269; *United States* v. *Rio Grande Irrigation Co.,* 174 U. S. 690. As the *Appalachian Power* case makes plain (311 U. S. 424, 427), the existence of property rights in the waters of a navigable stream are not dependent upon whether the United States is changing the flow of the river in aid of navigation or for some other purpose.

Nor can respondents' rights to recover be founded on the Acts which appropriated money for the Central Valley project. They created no independent right in any

claimant against the United States. That is the teaching of Justice Brandeis' opinion for the Court in *Mitchell* v. *United States,* 267 U. S. 341, 345–46. The appropriation in that case was for, *inter alia,* "losses to persons, firms, and corporations, resulting from the procurement of the land." In denying a claim for the loss of a business resulting from a taking of land, the Court said:

> "By including in the appropriation clause the words 'losses to persons, firms, and corporations, resulting from the procurement of the land for this purpose,' Congress doubtless authorized the Secretary of War to take into consideration losses due to the destruction of the business, where he purchased land upon agreement with the owners. But it does not follow that, in the absence of an agreement, the plaintiffs can compel payment for such losses. To recover, they must show some statutory right conferred."

The same is true in this case. For example, § 2 of the Rivers and Harbors Act of August 26, 1937, 50 Stat. 844, 850, provided that the Secretary of the Interior "may acquire by proceedings in eminent domain, or otherwise, all lands, rights-of-way, water rights, and other property necessary for said purposes." Authority to pay for water rights is, of course, not to be construed to mean an assumption of liability to pay.

Congress, to be sure, has full power to relinquish its immunity from suit for the taking. See *Ford & Son* v. *Little Falls Co.,* 280 U. S. 369, 377; *United States* v. *Realty Co.,* 163 U. S. 427, 440. And I think it has done so—not by the Acts appropriating funds for the project but by the Reclamation Act of 1902. 32 Stat. 388, 43 U. S. C. § 371 *et seq.*

The Act applies solely to the 17 western States. It deals with reclamation projects, as its title indicates. The Central Valley project is such a project.

Section 7 of the Act authorizes the Secretary of the Interior to purchase any rights necessary to the carrying out of the Act.[1]  Section 8 provides:

"That nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof: *Provided,* That the right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right."

Section 8 thus respects "any vested right" acquired under state water laws relating to irrigation, in "any interstate stream or the waters thereof."  When such rights will be destroyed or interfered with by a proposed reclamation project, authority is found to acquire them under § 7.  The customary method of acquiring the water rights is to file a notice of appropriation pursuant to state law.

---

[1] Section 7 provides: "That where in carrying out the provisions of this Act it becomes necessary to acquire any rights or property, the Secretary of the Interior is hereby authorized to acquire the same for the United States by purchase or by condemnation under judicial process, and to pay from the reclamation fund the sums which may be needed for that purpose, and it shall be the duty of the Attorney-General of the United States upon every application of the Secretary of the Interior, under this Act, to cause proceedings to be commenced for condemnation within thirty days from the receipt of the application at the Department of Justice."

Petitioner seeks to avoid the force of these Sections by asserting that they are not applicable to lands riparian to navigable streams.

The legislative history of the Act is not particularly instructive. The House Committee reporting the bill said that "Section 8 recognizes State control over waters of nonnavigable streams such as are used in irrigation." H. R. Rep. No. 1468, 57th Cong., 1st Sess., p. 6. There is no other evidence, however, that the framers thought the scope of the bill so narrow. When the Act was recommended in 1901, President Theodore Roosevelt was careful to suggest that there should be protection for "vested rights" and respect for state laws. 35 Cong. Rec. 6677, 6775–6776. There are statements to the same effect by Representative Mondell, who was in charge of the Bill in the House (35 Cong. Rec. 6678–6679) and by Senator Clark of Wyoming (35 Cong. Rec. 2222). The clause in § 8 according protection to "any vested right acquired" under state laws was added to the Bill by Committee amendment on the floor of the House. 35 Cong. Rec. 6762.

Whether § 8 authorizes payment for water rights riparian to navigable waters has not been authoritatively determined by the courts.[2] This Court has recognized, however, that administration of the Act is to be in conformity to state laws. See *Power Co.* v. *Cement Co.*, 295 U. S. 142, 164. *Nebraska* v. *Wyoming,* 325 U. S. 589, 614. That was the assumption in *Mason Co.* v. *Tax Commission,* 302 U. S. 186, a case involving the navigable waters of the Columbia River.

Whatever doubts there may be are for me dispelled by the administrative practice under the Act, as sum-

---

[2] A United States District Court for the Southern District of California has recently held, however, that § 8 of the Act provides for the purchase of water rights taken in connection with the Central Valley Project. *Rank* v. *Krug,* 90 F. Supp. 773 (April 12, 1950).

marized by the Commissioner of Reclamation in a memorandum dated April 19, 1950. Reports from the seven regional counsel and a review of the files in the Bureau of Reclamation formed the basis for the memorandum.

The Commissioner concluded that it has been the almost invariable practice of the Bureau to file notices of appropriations under state law without regard to whether the stream involved was navigable or nonnavigable.[3] Such filings were made pursuant to state law

[3] The memorandum records the following data: Region 1 (Washington, Idaho, northern Oregon, western Montana) reported the filing of appropriations under state law in 12 projects involving navigable rivers. In Region 2 (northern California, Oregon), § 8 has been construed to include rights in navigable as well as nonnavigable waters, although the exact number of filings was not revealed. Although some filings for appropriation under state law have been made in Region 3 (southern California, Arizona, southern Nevada), the lower Colorado River projects are the single exception to the otherwise consistent administrative practice. In Region 4 (northern Nevada, Utah, western Wyoming, western Colorado), water rights on at least two navigable rivers have been acquired pursuant to state law. No occasion has yet arisen in Region 5 (Texas, New Mexico, Oklahoma, southern Colorado) making necessary the acquisition of water rights on navigable streams. In the only instance in Region 6 (eastern Montana, northern Wyoming, North and South Dakota) where a federal project interfered with private water rights on a navigable river, the rights were paid for by the United States. Water rights on three apparently navigable rivers in Region 7 (eastern Colorado, southern Wyoming, Nebraska, Kansas) were acquired by the United States in accordance with state laws.

The Commissioner notes that there are special circumstances concerning the lower Colorado River projects which explain the single exception. The Act authorizing Hoover Dam required that it be used first for "river regulation, improvement of navigation, and flood control," and only thereafter for irrigation. 45 Stat. 1061. Moreover, the Colorado River Compact assures an adequate supply of water for the project. The Commissioner points out that while no rights have been acquired on the lower Colorado under § 7, "a search of Bureau records fails to disclose any instance on that river in which the Bureau in connection with any of its projects failed or refused to

on water rights riparian to at least 13 navigable or probably navigable rivers. This administrative practice is too clear to be contradicted by the Bureau of Reclamation documents cited by petitioner.[4] Moreover, the Commissioner of Reclamation has drawn our attention to recent public statements by Department of Interior officers confirming this practice.

This Court has often emphasized that weight is to be given to the interpretation of a statute made by the administering agency. See *United States* v. *American Trucking Assns.,* 310 U. S. 534, 549; *Labor Board* v. *Hearst Publications,* 322 U. S. 111, 130. This long course of practice by the Bureau of Reclamation resolves any doubts and ambiguities that arise from the history and wording of the statute.

I conclude that Congress by § 8 of the Reclamation Act agreed to pay (though not required to do so by the Constitution) for water rights acquired under state law in navigable as well as nonnavigable streams. As the Court holds, respondents under California law have a

recognize or make compensation for water rights validly established under State law."

Another possible exception is the decision of the Department of Interior not to purchase a power right on the Spokane River on the ground, among others, that the right affected navigable waters. Yet, in the past, the Bureau instituted appropriations on that river also.

[4] The unpublished Manual of the Bureau of Reclamation, printed for the guidance of its employees, supports petitioner's position in its 1913, 1917, and 1927 editions, and to a lesser extent in its 1938 edition. A new manual is now in preparation. These statements may have been based on an early decision of the Secretary of the Interior (*California Development Co.,* 33 L. D. 391), which also provides some support for the petitioner's position. The Commissioner of Reclamation, however, has explained that "despite the statement in earlier *Manuals* based upon the *California Land Development* opinion . . .," the Bureau's practice has been to make no distinction between navigable and nonnavigable waters.

water right. Section 8 therefore recognizes it as the basis for payment in connection with this federal project.

I do not think the claimants are entitled to interest. When the Government assumes a liability by statute, interest is not allowable unless specific provision is made for it. *United States* v. *Goltra,* 312 U. S. 203, 207; *United States* v. *Hotel Co.,* 329 U. S. 585, 588. A different rule obtains when the United States takes property protected by the Fifth Amendment. *Seaboard Air Line R. Co.* v. *United States,* 261 U. S. 299, 306. The present water rights, though not protected by the Fifth Amendment, are ones which the United States has agreed to pay for under §§ 7 and 8 of the Reclamation Act. Sections 7 and 8 contain no provision for the payment of interest. The Act refers to state law to determine whether a water right exists, not to ascertain the measure of damages for the taking.