NO. 83-323

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

_____

THE MONTANA POWER COMPANY,
A Montana Corporation,

                                Petitioner, Respondent and
                                Cross-Appellant,

        vs.

MARTIN CAREY, WALT DUTTON; JESSIE
S. FELSHEIM; SUSANNE L. HUCKABA;
MARY LEAVITT; ROBERT McDOWELL; REMI
and BETTY JO MONFORTON; DEPARTMENT OF
NATURAL RESOURCES AND CONSERVATION:
FRANK SHAW; JIM SIMONISH; and NORMA
and ERNEST TEBAY,

                                Defendants and Appellants,

        and

IN THE MATTER OF THE APPLICATION FOR
BENEFICIAL WATER USE PERMIT NO. 24921-s41e
BY REMI and BETTY MONFORTON,

                                Petitioners and Respondents.

_____

Appeal from:  District Court of the First Judicial District,
              In and for the County of Lewis & Clark,
              The Honorable W. W. Lessley, Judge presiding.

Counsel of Record:

        For Appellants:

                Leaphart Law Firm, Helena, Montana
                W. William Leaphart argued for Felsheim & Huckaba,
                 Helena, Montana
                Robert Lane argued for D.N.R., Helena, Montana
                Nicklas & Kline, for Dutton & McDowell, Helena, Montana

        For Respondents:

                Moore, Rice, O'Connell & Refling, Bozeman, Montana
                David C. Moon argued for Monfortons, Bozeman, Montana
                Gough, Shanahan, Johnson & Waterman, Helena, Montana
                Ronald Waterman argued for Mt. Power, Helena, Montana

        For Amicus Curiae:

                Ted J.Doney, Montana Water Development Assoc.,
                Helena, Montana

_____

                                Submitted: March 7, 1984

                                Decided: June 28, 1984

    JUN 28 1984
Filed:

        _Ethel M. Harrison_

_____
                    Clerk

Mr. Justice Frank B. Morrison, Jr. delivered the Opinion of the Court.

This appeal arises from two consolidated cases that originated as petitions for judicial review of a Department of Natural Resources and Conservation (DNRC's) final order which granted the Monforton's beneficial water use permit.

Monfortons applied for the use permit in October 1979 to appropriate water from Cold Springs, a tributary of the Boulder River. Montana Power Co. (MPC) and downstream irrigators (Huckaba/Felsheim) filed timely objections. Subsequent to a public hearing where applicants and all objectors were represented, the DNRC issued a final order granting the permit conditioned upon specific restrictions.

Petitions for judicial review filed by Monfortons and MPC were consolidated to be heard in the District Court of the First Judicial District Lewis and Clark County, Honorable W.W. Lessley presiding. Upon review, the court held that the DNRC exceeded its statutory authority by imposing restrictive conditions on the permit and reinstated the water use permit in accordance with the terms of the Monforton's application. Pursuant to Monforton's subsequent motion, the District Court imposed reasonable attorney's fees upon MPC and Huckaba/Felsheim.

Both MPC and Huckaba/Felsheim filed notices of appeal concerning both the granting of the use permit and the taxation of attorneys fees.

Monforton's permit application sought authorization to divert 1,575 gallons per minute up to 623 acre-feet per year from April 15 through October 15 of each year from Cold Springs for sprinkler irrigation on 331 acres of land in Jefferson County, Montana.

2

The objectors to the Monforton application collectively assert that insufficient unappropriated water flows in Cold Springs to satisfy both existing rights and the Monforton's proposed diversion. Montana Power Company (MPC), a Montana corporation, owns and operates six hydroelectric generation facilities located on the Missouri River downstream from the Monforton's proposed diversion point. Numerous existing water rights are appurtenant to these hydroelectric plants. Jessie Felsheim and Susanne Huckaba are members of a group of senior water right holders whose lands are also located downstream from the Monforton appropriation site.

DNRC's final order granted the Monforton's water use permit subject to the following limitations:

(1) The quantity of water to be appropriated was reduced from 623 acre-feet per year to 400 acre-feet per year.

(2) The period of time during which the appropriation could be made was limited to a period of time running from April 15 to August 1, rather than from April 15 to October 15.

(3) The permit was made subject to all prior and existing rights.

(4) The permit was made subject to the final determination of all prior and existing rights.

(5) The diversion authorized by the permit was expressly limited to times when Montana Power's Cochrane Dam is spilling water.

Upon review, the district court held that:

(1) The DNRC violated statutory provisions found in the Water Use Act by limiting the Monforton's period of use to a period ending August 1, and

3

(2) The conditions and limitations placed on the permit by the DNRC substantially prejudice the Monfortons' right to appropriate water.

To correct these errors, the trial judge granted the Monforton's permit and modified the DNRC's final order:

(1) To allow a period of use running from April 15 to October 15;

(2) To allow diversion and appropriation of up to 623 acre-feet per year; and

(3) To remove the condition that Montana Power's Cochrane Dam be spilling before the Monfortons can divert water.

From the District Court's judgment and subsequent determination of attorneys' fees the defendants appeal. Although numerous questions are presented upon appeal, this court finds the following issues dispositive:

(1) Whether sections 85-2-311 and 85-2-312, MCA grant the DNRC the authority to control and condition beneficial water use permits?

(2) Whether there is substantial credible evidence to support the DNRC's order?

(3) Whether the District Court erred in taxing reasonable attorneys fees and costs?

Section 85-2-312, MCA provides in pertinent part as follows:

> "Terms of permit. (1) The department may issue a permit for less than the amount of water requested, but in no case may it issue a permit for more water than is requested or than can be beneficially used without waste for the purpose stated in the application. The department may require modification of plans and specifications for the appropriation or related diversion or construction. It may issue a permit subject to terms, conditions, restrictions, and limitations it considers necessary to protect the rights of other appropriators, and it may issue temporary or

4

seasonal permits. A permit shall be issued subject to existing rights and any final determination of those rights made under this chapter.

"(2) The department may limit the time for commencement of the appropriation works, completion of construction, and actual application of the water to the proposed beneficial use. In fixing those time limits, the department shall consider the cost and magnitude of the project, the engineering and physical features to be encountered, and, on projects designed for gradual development and gradually increased use of water, the time reasonably necessary for that gradual development and increased use. For good cause shown by the permittee, the department may in its discretion reasonably extend time limits."

To hold that the DNRC does not have authority to grant conditional use permits belies the plain language of this statute which clearly grants such power. Restrictions must be necessary to protect the rights of prior appropriators or be related to time limits to perfect the water right under the permit. Without such authority, the DNRC could only grant an application as applied for, or deny it, resulting in a permit system creating inchoate rights. Such uncontrolled development of a valuable natural resource contradicts the spirit and purpose underlying the Water Use Act.

State ownership of the water resource was recognized early in the evolutionary stages of water law.

"[T]he state of Montana has by necessary implication assumed to itself the ownership, sub modo, of the rivers and streams of this state, and, . . . has expressly granted the right to appropriate the waters of such streams, which right if properly exercised . . . vests in the appropriator full legal title to the use of such waters by virtue of the grant made by this state as owner of the water." Smith v. Denniff (1900), 24 Mont. 20, 21-22, 60 P. 398 (emphasis in original). See also, Allen v. Petrick, supra, 69 Mont. at 377; and Mettler v. Ames Realty Co. (1921), 61 Mont. 152, 161, 201 P. 702.

State ownership of the water resource was asserted in unambiguous terms by the 1971 Montana Constitution.

"(3) All surface, underground, flood, and atmospheric waters within the boundaries of the state are the property of the State for the use of

5

its people and are subject to appropriation for beneficial uses as provided by law." Mont. Const. Art. IX, §3 (1972) (emphasis added).

Prior to 1973, when the Water Use Act was enacted, neither of the two distinct methods of acquiring water rights provided the state any control over acquisition of this state-owned natural resource. The first statutory method of appropriating water, legislated in 1885, required a prospective appropriator to post written notice at the place of intended diversion, and within twenty days of posting to file similar notice with the clerk and recorder in the county of the proposed diversion. Sections 89-810 through 89-814, R.C.M., (1947). Since the legislature did not declare this statutory method the exclusive method of acquiring water rights, the historical mining and local customs remained effective giving a water right to any individual who diverted water from a water source and applied the water to a beneficial use. Bailey v. Tintinger (1912), 45 Mont. 154, 169, 122 P. 575. The absence of a public record made the court's task of determining the relative priority of conflicting claims to use the water resource an impossible task. The State had no means to regulate proposed water uses to accommodate available water flows and protect existing senior water rights nor to insure that the public interest was being promoted.

The Water Use Act, Section 85-2-101 et seq., MCA, was enacted in 1973. As the culmination of consistent urgings for reform, it "substituted a new procedure for the appropriation of water rights, . . .." General Agriculture Corp. v. Moore (1975), 166 Mont. 510, 512, 534 P.2d 859. This reform was formulated upon beliefs similar to those expressed earlier by Mr. Elwood Mead, Wyoming's first State Engineer:

6

"[I]f state ownership is to be anything but a delusion, if it is to be more than nominal, there must be the same authority and control over streams and over diversion of water as is now exercised by the general government over the occupation and settlement of public lands . . . Such oversight and precaution is necessary for the proper protection of public interests . . . and in order that controversies growing out of extravagant and injurious claims may be avoided." Wyoming Hereford Ranch v. Hammond Packing Co. (1925), 236 P. 764, 769.

The Water Use Act emphasizes the underlying policy of state participation in water appropriation "to recognize and confirm all existing rights to the use of any waters . . .." Section 85-2-101(4), MCA. This unambiguous language of the legislature promotes the understanding that the Water Use Act was designed to protect senior water rights holders from encroachment by junior appropriators adversely affecting those senior rights. Section 85-2-312, MCA mandates the state's authority to afford such protection.

The record of the trial proceeding contains substantial, credible evidence that the water supply source in Cold Springs was inadequate to sustain the Monforton's proposed appropriation along with existing senior rights without the restrictions imposed by the DNRC.

Diana C. Fitz, a hydrologist for the Department of Natural Resources, in the Water Sciences Bureau, compiled a report entitled "Analysis of Water Availability on the Missouri River Above Canyon Ferry Reservoir." Based on this documentation, Ms. Fitz' testimony confirms the unavailability of water subsequent to the August 15 cutoff date imposed by the DNRC:

"Based on the data I had from Bureau of Reclamation and the U.S.G.S. I found that water was available during a short period of time during the spring and extending through at least a majority of irrigation season, on occasion. Basically, I found, for the most part, there was no water available 40% of the years. And, that during the other 60% of the years, there would be some water extending as long

7

as possibly the beginning or maybe 9th or 10th of August."

Representing Montana Power Co., Mr. Don Gregg testified that: (1) the Cochrane facility has the largest turbine capacity of putting water to beneficial use on the Missouri River, (2) the turbine rating is about 10,000 cubic feet per second; (3) the Cochrane plant has very limited storage capability, which handles daily fluxuations in the river, but no seasonal storage; and (4) when the Bureau of Reclamation's rights have been satisfied at Canyon Ferry and the excess water is spilled, Cochrane utilizes only 27% of that spillage to satisfy MPC's water rights for beneficial use.

Using hydrographs depicting available water flow over the past twenty years, Mr. Gregg's further testimony supported the lack of unappropriated water after the August 15 date restriction imposed on Monforton's beneficial use permit:

"Q: Taking that into account, what would be your testimony, as to the . . . shall we say, the time window when water may be available or flowing in the river above 10,000 c.f.s?

"A. . . . on the basis of the 19 or 20 years history tabulated on this exhibit, that there will be around 71 days, starting on . . . around April 30 and ending on around July 10. When water will be available in . . . anywhere in the Upper Missouri Basin, above Great Falls, in excess of that that we can use at Great Falls, at the Cochrane plant."

Based upon this credible testimony the District Court's judgment is reversed and the DNRC's final order is reinstated granting the beneficial water use permit conditioned by appropriate restriction.

In conjunction with this ruling, the Monforton's claim for attorney's fees must be denied. Since the final order of the DNRC is affirmed, the Monfortons are not the prevailing party and cannot recover attorney fees from the respondents.

Reversed.

_____
                        Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

_____
Honorable Thomas A. Olson,
District Judge, sitting in
place of Mr. Justice John
C. Sheehy


District Judge Thomas A. Olson, sitting in place of Justice
Sheehy dissents:

I agree with the majority that the Department of Natural
Resources and Conservation (DNRC) has statutory authority to
impose conditions or limitations on a new water permit to
ensure that senior appropriators are not left short of water.
In this case, I would approve of DNRC's condition that Monforton
not irrigate if the senior users needed water. The practical
effect of such a limitation would vary from year to year,
depending upon the availability of water for irrigation. As
I shall point out herein, such a limitation makes good sense

9

because of the unpredictability of our Montana weather. Despite the advances made by science, our technology cannot tell us what quantity of water is going to be available in future years. However, DNRC went much further in this case and attached another limitation on Monforton: no irrigation in August, September or October of _any_ year.

My dissent, therefore, is to this last condition formulated by DNRC which, in effect, attempts to predict the future water availability, thus resolving any doubts against Monforton, and in favor of the senior appropriators. For over a hundred years Montana water law was based on simple practicality. If there is water available, then it should be put to a beneficial use in this arid state. For example, this Court long ago endorsed the idea that the first persons to put water to a beneficial use received a right that had priority over others who came later. Mettler v. Ames Realty Co., 61 Mont. 152, 201 P. 702 (1921). To balance what might, on its face, seem to be an invitation to waste or abuse water, this Court recognized a counterbalancing obligation that a senior water user could appropriate only that amount of water that he could beneficially use, and which was necessary for his purposes. Custer v. Missoula Public Service Co., 91 Mont. 136, 6 P.2d 131 (1931); Zosel v. Kohrs, 72 Mont. 564, 234 P. 1089 (1925); and Norman v. Corbley, 32 Mont. 165, 79 P. 1059 (1905). This Court held that a senior water user had an obligation to leave in the stream water he could not put to use so that the water was available for others. Tucker v. Missoula Light and Water Co., 77 Mont. 91, 250 P. 11, 15 (1926); Creek v. Bozeman Waterworks Co., 15 Mont. 121, 38 P. 459, 461 (1894); and, Zosel v. Kohrs, supra, at 1093. Indeed, those who followed after the senior appropriator could use the available water without

10

obtaining his permission.  Custer v. Missoula Public Service Co.,
supra, at 134.  See also, Zosel v. Kohrs, supra, at 1093; Norman v.
Corbley, supra, at 1060; and Tucker v. Missoula Light and Water Co.,
supra, at 15.

This is not to say that all was well with Montana water
law.  The system had serious defects.  Professor Albert Stone
has noted these:

1. Legislative attempts to require water users to
   file a notice of appropriation were ineffectual.

2. County water records were virtually useless in
   determining the amounts of water actually being used.

See Stone, "Montana Water Rights--A New Opportunity,"
34 Montana Law Review at 68.

In 1973, the legislature adopted the Water Use Act, presum-
ably to correct these and other defects.  In its stated policies,
the legislature again endorsed the time-tested basis for Montana
water law:  that water resources of the state be put to optimum
beneficial use and not wasted.  Section 85-1-101(1), M.C.A.,
1983.  As between appropriators, the first in time is the first
in right.  Section 85-2-401, M.C.A., 1983.  An irrigator who
diverts more water than he can "actually and necessarily" use
must return it to the stream for others.  Section 85-2-412, M.C.A.,
1983.  The district court, not DNRC, was given jurisdiction to
supervise the distribution of water among appropriators.  Section
85-2-406, M.C.A., 1983.  Aggrieved senior water users retained
their traditional access to the district court.  Section 85-2-406,
M.C.A., 1983.

To solve the notice and recordation problems, all new
applicants were to petition DNRC for permission to divert and
use water through a permit system.  Section 85-2-302, M.C.A.,
1983.  The department was obligated to issue a new water permit

11

if the applicant "by substantial credible evidence" showed there was water available and the rights of others would not be adversely affected. Section 85-2-311, M.C.A., 1983. Based on the context in which this new act came into being, I can only conclude that the legislature was determined to preserve the best of our hundred-year experience with the use of water in this state, supplemented by a workable regulatory scheme.

By conditioning Monforton's use of water to times when the senior appropriators, including Montana Power's Cochrane Dam, needed water, DNRC clearly found that there was substantial credible evidence that water was available and the rights of others would not be adversely affected as required by section 85-2-311, M.C.A., 1983. Having so found, the department added the objectional condition, that there could be no irrigating by Monforton from and after August 1 of every year. The only explanation that I can attach to the department's actions, having found water available earlier in any year, is that this would allow Monforton's permit to clutter the records by showing the right to use water in the fall, when the likelihood was there would not be enough water available for him. Thus it could be argued our water records would be headed back down the road from whence we had come, records showing water usage but with no assurance that the water user was actually in a position to use the water described.

I find this kind of analysis implicit in the majority opinion. I also find it unpersuasive. The department, supported by the majority opinion, is splitting hairs here. It finds a new irrigator can irrigate for the first half of the season, with the senior appropriators protected by the conditions of the permit, but since there _may_ not be water in the second half, a flat

12

prohibition is issued. I am unable to find clear legislative authority for such arbitrary conditions, when we have the assurance that in all events the senior water users will be protected.

Traditionally, "substantial evidence" has been held to be different, and less stringent than "a preponderance of evidence". Strachan Shipping Co. v. Shea, 276 F.Supp. 610 (1967). I would find that Monforton's proof which the department found, substantial and credible for the first half of the irrigation season sufficient to authorize a water permit for the entire season, subject to protecting the senior users.

Looking at the record in this particular case, I find there is evidence to support a finding that Monforton could irrigate in August, September and October. Lest the uninformed reader think irrigators only use water in the spring, one need only travel the back roads of Montana to see prudent farmers building up soil moisture in the fall.

Starting with the obvious, Monforton stands to lay out significant sums of money for an irrigation system, which speaks convincingly that he believes there is excess water, either from extra moisture or from non-use of the other appropriators. The senior appropriators could not agree among themselves on when extra water was available in the Boulder River after August 1. Sonny Huckaba testified that the river was usually dry in August but that there were wet years with more than enough water to meet his needs. Shaw testified that there was never water after the 1st of August. Montana Power's evidence was also disputed. MPC is contesting new appropriations in the upper Missouri River, to protect its generating facility at Cochrane Dam, near Great Falls, which has only limited storage capabilities. But DNRC

seems not to have given much credence to MPC's concern because the record shows it issued recent water permits with dates late into the fall. (September 15 for Brown, 12016-s41G, October 15 for Lane, 11493-s41G, and October 15 for Robbie, 20301-s41F) Even DNRC's reports were not entirely consistent with when and where there was water in the Boulder for extra irrigation. So an objective view of the record leaves the reader with an impression that the extra water is an "off and on" proposition. Given the vagaries of our Montana weather, this should come as no surprise. But one would think that all this uncertainty would be taken into consideration when DNRC attached the usual protection for senior appropriators, including the admonition to Monforton to irrigate only when Montana Power was "spilling water" over the top of Cochrane Dam. However, as I have indicated, DNRC went further and prohibited any fall irrigation.

Reduced to its bare essence, as I see it, the majority is holding that even though the senior appropriators are protected by the first condition, the integrity of the filing system is to be protected at the cost of limiting a new irrigator, even though there are times that water might be available in the prohibited time period. This, to me is exalting form and procedure over substance. Up to this point in time, we have been telling the Monfortons of this state, "put all the water you can to a beneficial use." Now we say, "DNRC's records come first, and if there is a doubt there will be no water usage, even if water is available in the future." I do not believe it is in the best interests of this state, nor did the legislature envision, giving authority to a state agency to act in such an arbitrary or capricious manner.

14

I would approve the issuance of a permit to use water to Monforton, conditioned only that he not use water when the senior appropriators had need for the water under their prior rights. I would affirm Judge Lessley's decision for the reasons stated.


_____
Honorable Thomas A. Olson,
sitting in place of
Mr. Justice John C. Sheehy